UNITED STATES of America,
Appellee,

v.

Clyde FEYRER, Murray Goldenberg,
Defendants,

Cameron Yost, Defendant–Appellant.

Docket No. 01–1543.

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 2002.

Decided June 18, 2003.

Robert M. Simels, Robert M. Simels, P.C., New York, New York, for Defendant–Appellant.

Rosemary Nidiry, Assistant United States Attorney, New York, New York (James B. Comey, United States Attorney, Christine H. Chung, Assistant United States Attorney, Southern District of New York, New York, New York, of counsel), for Appellee.

Before: FEINBERG, CARDAMONE, and SACK, Circuit Judges.

CARDAMONE, Circuit Judge.

Cameron Yost (defendant or appellant) was convicted of securities and wire fraud after an 11–day jury trial. He appeals from his judgment of conviction entered on November 20, 2001 in the United States District Court for the Southern District of New York before Chief Judge Michael B. Mukasey.

Yost's appeal presents us with two issues to resolve. One arises from the denial of his motion for severance of his trial from that of a co-defendant; the other and more complex issue arises out of the denial of his motion for a new trial based on a claim of his counsel's actual conflict of interest. Because a lawyer owes to a client a duty of undivided loyalty, it follows that no lawyer can serve two masters, where to do so places the lawyer under inconsistent duties—that is, a duty to argue for one client that which his duty to another client requires him to oppose.

## BACKGROUND

Yost had been indicted and charged with conspiracy to commit securities fraud and wire fraud and to violate the Travel Act through commercial bribery in violation of 18 U.S.C. § 371. He was also charged with a substantive count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, and with three substantive counts of wire fraud in violation of 18 U.S.C. § 1343. Defendant was convicted on all counts charged, and sentenced to five years probation, restitution in the amount of $269,858.63 and a $500 special assessment.

The charges against defendant were based on his participation in a 1996 scheme designed to create artificial demand for the common stock of Banyan Corporation (Banyan), a company which he controlled and of which he was also president. The scheme envisioned inducing stock brokers employed by the Symons Financial Group to recommend Banyan stock to their customers by offering them bribes. A co-defendant, Murray Goldenberg, not a party to this appeal, was convicted at the same trial of participating in a parallel scheme to manipulate demand for the stock of First Colonial Ventures, Ltd. (First Colonial), a company he controlled.

The indictment that charged Yost and Goldenberg also implicated Clyde Feyrer who, it was alleged, was a middleman in both schemes between Yost and Goldenberg, on the one hand, and the principals of the Symons Group, on the other. Feyrer did not stand trial because, pursuant to a cooperation agreement, he pled guilty and subsequently was sentenced to five years probation.

In its case against Yost, the government presented evidence that from April to December 1996 he successfully defrauded purchasers of Banyan stock. The princi-

pal proof against him consisted of the testimony of Feyrer and Richard Wolff, an associate of the Symons Group. Both men attended a meeting at Caesar's Palace Hotel in Las Vegas, Nevada, with Yost, Goldenberg, and Scott Symons, the Symons Group's owner. They testified that at the meeting the conferees discussed bribing brokers to buy stock for their customers in the corporations that Yost and Goldenberg controlled. Wolff and Feyrer suggested that their brokers would recommend Banyan and First Colonial to their clients. The evidence further showed that Feyrer, Wolff, Yost and Goldenberg arranged to transfer shares of Banyan and First Colonial to Feyrer's control so that he could use those shares to pay the brokers at the Symons Group as an inducement to them to promote the Banyan and First Colonial stock. The testimony of Feyrer and Wolff was corroborated by the testimony of a Symons Group broker who explained that he and others at his firm received secret payments for selling stock, and that they withheld from prospective customers the fact that they were being paid to recommend those stocks.

Extensive documentary proof further supported Feyrer's and Wolff's accounts of the manner in which bribes in the form of Banyan and First Colonial stock were routed to the brokers at the Symons Group. For example, brokerage and bank records reflected that beginning in April and continuing through December 1996, large blocks of Banyan stock were delivered into Wolff's Canadian brokerage accounts from accounts controlled by Feyrer. When the stock was sold from Wolff's accounts, the proceeds were transferred by wire to bank accounts in Florida controlled by Wolff, Feyrer, and their nominees. The government also presented evidence demonstrating that the vast majority of the retail buying in Banyan stock during the span of the stock manipulation conspiracy was generated by the clearing agent for the Symons Financial Group brokers.

On appeal, Yost contends principally that the district court erred by denying his motions for severance and his motion for a new trial. He asserts he should have been tried separately from co-defendant Goldenberg. Defendant also urges that he should have been granted a new trial premised on an allegation that his counsel had a conflict of interest and was, in addition, ineffective in providing him assistance. Because we find no error in the trial court's dispositions of these issues, we affirm.

## DISCUSSION

### I Severance Motions

■ Defendant's motions for severance were made both before and after Feyrer's guilty plea, pursuant to Federal Rules of Criminal Procedure 8(b) and 14. Yost challenges his and co-defendant Goldenberg's joint trial as prejudicial because the indictment, in his estimation, charged them with involvement in two separate conspiracies.

■ Rule 8(b), which governs the joinder of two or more defendants in the same indictment, permits such joinder if the joined defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). The propriety of Rule 8 joinder raises a question of law subject to *de novo* review. Unless the standards set out in Rule 8(b) are met, a motion for severance should be granted even absent a showing of prejudice. *See United States v. Lane*, 474 U.S. 438, 449 n. 12, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir.1988).

In support of his contention that he and Goldenberg were improperly joined, Yost asserts that they were actually accused of two separate and distinct conspiracies. He maintains that the Banyan and First Colonial conspiracies did not involve a common object and that they were neither factually nor temporally related. Appellant also points out that neither he nor Goldenberg was charged in the conspiracy counts of the other, and that Feyrer, the only defendant charged with participating in both conspiracies, pled guilty prior to trial.

In *United States v. Attanasio*, 870 F.2d 809 (2d Cir.1989), we read the language of Rule 8(b) to mean that the joinder of defendants is proper when the alleged acts are "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *Id.* at 815. There can be no doubt that the charges against Yost and Goldenberg were united by overlapping facts and participants and a common plan. For instance, Feyrer, Wolff and the brokers at the Symons Group were common and central participants in both stock manipulation plans. The fact that neither Feyrer nor Wolff was tried alongside Yost and Goldenberg does not alter the significance of their participation. Moreover, the two conspiracies shared a common plan, namely, to generate income for Feyrer, Wolff and the Symons Group brokers through fraudulent stock transactions.

It is also true that the schemes were run at the same time and that—after participating in the Las Vegas meeting with Feyrer and Wolff—Yost and Goldenberg were aware of each other's participation in fraud. Indeed, even if the district court had tried these two defendants separately, the evidence at one trial would essentially duplicate the evidence at the other, as the district court found. We use a common

sense approach when considering the propriety of joinder under Rule 8(b) and, in the instant case, we think "a reasonable person would easily recognize the common factual elements that permit joinder." *Turoff*, 853 F.2d at 1044. In consequence, the joinder did not violate Rule 8(b).

 Even with proper joinder under Rule 8, Rule 14 provides that a district court may nonetheless grant a severance of defendants' joint trial "[i]f it appears that a defendant or the government is prejudiced by a joinder." Fed.R.Crim.P. 14(a). Rule 14 severance does not raise a question of law for our review; rather, its application is tested under the abuse of discretion standard. The Supreme Court has instructed that a district court should grant a Rule 14 severance motion only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The risk of prejudice associated with joinder varies with the facts of each case. A trial court is most likely to grant a severance under Rule 14 in situations where the risk of prejudice is high. *Id.* Even in those situations, less drastic measures—such as limiting instructions—often suffice as an alternative to granting a Rule 14 severance motion. *Id.*

 For reasons of economy, convenience and avoidance of delay, there is a preference in the federal system for providing defendants who are indicted together with joint trials. *See Zafiro*, 506 U.S. at 537, 113 S.Ct. 933; *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir.1999). And, as noted, the decision whether to sever under Rule 14 is confided to the sound discretion of the trial court. *See id.; United States v. Weisman*, 624 F.2d 1118, 1129–30 (2d Cir.1980). We rarely overturn

the denial of a motion to sever. *See, e.g., United States v. Salameh,* 152 F.3d 88, 115–16 (2d Cir.1998) (per curiam) (finding no abuse of discretion in district court's denial of a severance motion). Thus, a trial court's denial of a severance motion under Rule 14 will be reversed for abuse of discretion only when a defendant can show such severe prejudice that his conviction may be said to be a miscarriage of justice. *See United States v. Rosa,* 11 F.3d 315, 341 (2d Cir.1993).

Appellant urged before trial that a joint trial with Goldenberg would prejudice him because it created risks of evidentiary spillover and jury confusion. Chief Judge Mukasey rejected this argument reasoning that because each defendant was aware of the manipulation scheme involving the stock of the other's company, and in fact attended the same conspiratorial meeting in Las Vegas, proof of both schemes would be admissible against both defendants, even at severed trials.

The district court therefore ruled there was no prejudice to either defendant that was unique to a joint trial, and that to the extent that any prejudice arose it could be cured by jury instructions and by the careful presentation of evidence by competent counsel. At the conclusion of the trial, Chief Judge Mukasey provided the jury— with no objection from appellant—a charge properly reminding the jury that appellant was accused of the Banyan scheme and Goldenberg of the First Colonial scheme, specifying that separate consideration was to be given to each count against each defendant. Consequently, the denial of appellant's Rule 14 motion for severance may not be said to be an abuse of discretion.

## II Ineffective Assistance of Counsel

Yost's principal contention on appeal is that it was error to deny his motion to set aside his guilty verdict and grant him a new trial because, as he declares, his trial had been prejudiced by the ineffective assistance of his counsel. He advances two distinct arguments with respect to this claim: (1) one of his attorneys had an actual conflict of interest; and (2) there was a potential conflict of interest and there were a number of other alleged deficiencies in the legal representation he received. We take up each of these arguments in turn.

### A. Actual Conflict of Interest

Six months after his conviction, appellant moved for a new trial pursuant to Federal Rule of Criminal Procedure 33 alleging that one of his two attorneys, Roger Fidler, Esq., labored under an actual conflict of interest. This motion was made by attorney Robert Simels, Esq., who had been contacted by attorney Fidler for assistance in handling defendant's trial one month before it began. The district court initially denied the motion for a new trial in a written opinion. Appellant subsequently urged the trial court to conduct an evidentiary hearing, which it agreed to do. After holding an evidentiary hearing, Chief Judge Mukasey handed down an amended opinion adhering to his original denial of appellant's Rule 33 new trial motion.

### 1. Law Governing Conflicts of Interest

The Sixth Amendment guarantees a criminal defendant the right to counsel, and with that guarantee comes the correlative right that such representation be free from conflicts of interest. *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Whether a defendant's lawyer's representation violates this right is a mixed question of law and fact that we review *de novo. See United States v. Schwarz,* 283 F.3d 76, 90–

91 (2d Cir.2002) (citing *United States v. Blau,* 159 F.3d 68, 74 (2d Cir.1998)).

While a defendant is required to demonstrate prejudice to prevail on most claims of ineffective assistance of counsel, *see Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the same showing is not necessary when a defendant's counsel is burdened by an actual conflict of interest because, under such circumstances, prejudice is usually presumed. *Id.* at 692, 104 S.Ct. 2052. This presumption is not conclusive. In order for a defendant to prevail on a claim that he was denied effective assistance of counsel based on counsel's actual conflict, the defendant must still establish that (a) counsel actively represented conflicting interests, and (b) such conflict adversely affected his lawyer's performance. *Id.; see also Cuyler v. Sullivan,* 446 U.S. 335, 348, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (discussing standard for obtaining relief from conviction based on an actual conflict); *accord Schwarz,* 283 F.3d at 91.

We have held previously that "[a]n attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Id.* at 91. An actual conflict of interest does not present grounds for a new trial if it does not rise to more than "a·mere theoretical division of loyalties." *See Mickens v. Taylor,* 535 U.S. 162, 171, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). To obtain a new trial, a defendant must prove that the conflict manifested itself as "an actual lapse in representation." *See Cuyler,* 446 U.S. at 349, 100 S.Ct. 1708. To prove the lapse in representation "a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Schwarz,* 283 F.3d at 92; *see also Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993). With respect to the substance of the plausible alternative strategy, the defendant need not show that the defense would necessarily have been successful had it been used, only that "it possessed sufficient substance to be a viable alternative." *Winkler,* 7 F.3d at 309.

### 2. Appellant's Allegations of Actual Conflict

As Yost tells it, attorney Fidler had an actual conflict of interest arising from his simultaneous representation of Yost and Paul Syracuse, an associate of Feyrer and Banyan investor who was also under investigation by the United States Attorney's office for allegedly participating in a broker-bribery scheme with Feyrer. Appellant avers that Fidler's actual conflict of interest became apparent when Syracuse offered to provide exculpatory testimony and other evidence, including taped phone conversations, at appellant's trial. He says Fidler led him to believe that Syracuse would be an important witness for him and, in fact, that Syracuse's testimony would be the centerpiece of his defense.

Although Syracuse did initially offer to testify, this offer was withdrawn after the commencement of Yost's trial. Syracuse withdrew his offer after retaining a second lawyer—Thomas Sjoblom, Esq.—who contacted the United States Attorney's office and thereafter allegedly advised Syracuse that the government would come after him if he testified for Yost. Appellant contends that he was therefore deprived of the effective assistance of counsel because, despite the fact that Syracuse had exculpatory information, Fidler—operating under dual loyalties towards him and Syracuse—

failed to secure Syracuse's testimony, resulting in the collapse of his defense.

We review the relevant record for proof in support of these allegations. Attorney Simels submitted two affidavits to the district court in support of Yost's motion. In them he made a litany of assertions regarding the relationships and interactions of Yost, Fidler, Syracuse, Sjoblom, and the United States Attorney's office. Observing that Simels was not a direct participant in the events that determine whether Fidler had a conflict of interest, the district court ruled that Simels' affidavits—consisting principally of what he was told by Fidler, Syracuse and Yost—constituted, for the most part, inadmissible hearsay. Yost's affidavit, in support of his motion, also relied heavily upon a recounting of statements made to him by Fidler. Hence, the district court concluded that it too is similarly inadmissible hearsay to the extent that it addresses Fidler's relationship with Syracuse, Sjoblom's dealings with the United States Attorney's office, and what potential defense witnesses would have said at trial.

Attorney Fidler submitted a letter that the trial court found was rambling and contradictory, contained inadmissible hearsay, and of little or no value on the issue of an actual conflict in representation. The primary admissible evidence regarding the alleged conflict of interest comes from two affidavits by Syracuse, an affidavit from Assistant United States Attorney Patrick Smith, and the hearing testimony of Fidler and Syracuse.

With these sources of proof in mind, we turn now to the threshold question of whether Fidler actively represented conflicting interests. *See Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. The district court was not sure whether Fidler's representation of Syracuse was truly active. It found the record ambiguous regarding the spe-cifics of that representation—attributable, for example, to Fidler's perfunctory statement that Syracuse was a client of his and Syracuse's similarly unelaborated statement that he requested and obtained advice from Fidler. Even so, the trial court assumed, without deciding, that Fidler actively represented both Yost and Syracuse. Based on this assumption, it thought the interests of Yost and Syracuse diverged with respect to what course of action should be taken, *see Schwarz,* 283 F.3d at 91 (citing *Winkler,* 7 F.3d at 307), namely, whether Syracuse should testify at Yost's trial. Accordingly, the district court analyzed Yost's motion on the assumption that an actual conflict of interest existed. Like the district court, we assume for purposes of this appeal that Fidler was confronted with an actual conflict of interest.

### B. *Resolution of Actual Conflict Issue*

We next consider whether the conflict affected counsel's performance. In our estimation, it did not. To prevail on his claim that his representation was compromised by an actual conflict of interest, appellant had to demonstrate that Fidler was confronted with more than a "theoretical division of loyalties" and prove instead that Fidler's representation of Syracuse actually affected the adequacy of his representation of Yost. *See Mickens,* 535 U.S. at 171, 122 S.Ct. 1237. Thus, it was incumbent upon him to present evidence that Syracuse's potential testimony at trial represented a plausible alternative defense strategy and that Fidler failed to secure that testimony because doing so conflicted with Fidler's other loyalties. *Schwarz,* 283 F.3d at 92; *Winkler,* 7 F.3d at 309. Yost did not meet either burden.

In his submissions to us appellant declares that Fidler's conflict of interest adversely impacted his defense because Fidler failed to subpoena Syracuse. In

support of his assertion that the pursuit of Syracuse's testimony was a viable alternative defense strategy, Yost points to averments by Syracuse in his second affidavit that government witness Feyrer acted alone in his relationships with Richard Wolff, and without the knowledge of Cameron Yost, and that Feyrer lied about many significant matters during Yost's trial. Syracuse further elaborated on his potential trial testimony at the district court's evidentiary hearing, declaring on direct examination that he became very upset after reading portions of the transcript from Yost's trial because he "had documentation with [Feyrer's] signature on it in writing and on tapes that counteracted everything [Feyrer] said, about 90 percent of what he said."

We have held previously that a defendant represented by conflicted counsel need not demonstrate that the alternative strategy or tactic foregone by counsel was reasonable. Rather, the defendant need only prove that the alternative strategy was plausible. *United States v. Malpiedi,* 62 F.3d 465, 469 (2d Cir.1995). Despite this relatively low standard, we are not persuaded, after a close examination of the record, that the pursuit of Syracuse's testimony amounts to a plausible alternative trial strategy for Yost.

The problems with Syracuse's potential trial testimony are myriad and severe. First, the district court correctly ruled that Syracuse's statement regarding Yost's knowledge of Feyrer and Wolff's stock manipulation activities is beyond Syracuse's competence as a witness and is based on inadmissible hearsay. Second, regarding Syracuse's broad challenge to the truthfulness of Feyrer's trial testimony, Syracuse subsequently admitted on cross-examination at the evidentiary hearing that he had only reviewed eight to 11 transcript pages of Feyrer's testimony, out of a narrative that extended for two or three days and occupied several hundred pages of transcript. Syracuse also admitted that he only reviewed pages that were pointed out to him, and that he only looked at those pages to evaluate certain statements that Feyrer made about him. Third, to the extent that Syracuse might have challenged any of Feyrer's testimony, that testimony—as elicited by the government—did not implicate Yost and was peripheral to the government's case against him. The only testimony from Feyrer that pertained to both Syracuse and Yost was elicited by Yost's own attorney (Simels not Fidler) on cross-examination. Fourth, Syracuse was forced to acknowledge during cross-examination at the hearing that the allegedly exculpatory tapes he possessed only contained the voice of Yost's co-defendant Goldenberg, and not Yost's, Feyrer's, or Wolff's. Finally, Syracuse's testimony at the evidentiary hearing contradicted his two affidavits—including an affidavit sworn to during his testimony—seriously undermining his credibility as a witness.

Even had appellant presented evidence that the pursuit of Syracuse's testimony at trial in fact represented a plausible alternative defense strategy, he would still have to demonstrate that Fidler failed to secure Syracuse's testimony because such pursuit was inherently in conflict with Fidler's other loyalties. *Winkler,* 7 F.3d at 309. The district court found that Syracuse's unavailability as a witness did not result from Fidler's alleged dual representation of Yost and Syracuse, but from Syracuse's apparent involvement in the underlying facts—an involvement that did not come about through any connection with Fidler—and Syracuse's resulting decision to invoke his Fifth Amendment rights.

Syracuse, for his part, proffered contradictory reasons as to why he chose to

withdraw his offer to testify on Yost's behalf. During direct examination at the evidentiary hearing he intimated he was informed by his attorney Sjoblom, who had contacted the United States Attorney's office, that if he testified it would challenge his credibility. Syracuse went on to explain that, as a result, "[i]f I would be subpoenaed I would assert the Fifth Amendment, right, wrong or indifferent." Curiously, when asked by the government on cross examination if he didn't testify because he was worried about incriminating himself, Syracuse responded that he didn't testify because there were certain names on the tapes that he didn't want surfacing. Even stranger, Syracuse immediately offered and spelled out one such name, which he claimed was connected to "the mafia." After this bizarre twist Syracuse, when confronted with statements from his first affidavit, confirmed the plain sense of his initial affidavit—namely, that he refused to testify because he was concerned for his own position and didn't want the government to come after him.

A review of Yost's submissions reveals that, beyond bald assertions, he presents no evidence that Fidler failed to pursue Syracuse's testimony because of an actual conflict of interest. Although it might be possible, absent evidence to the contrary, to infer that the pursuit of Syracuse's testimony was foreclosed by a conflict of interest, Syracuse's own testimony suggests otherwise. To begin with, although we stated earlier that the extent to which Fidler actively represented both Yost and Syracuse was unclear, Syracuse's testimony decisively indicates that, with respect to the point at which he was deciding whether to testify for Yost, Syracuse was represented by Sjoblom and not Fidler. Further, any relationship that he had with Fidler notwithstanding, Syracuse maintains—in both of his affidavits and in most of his hearing testimony—that he made an independent decision not to testify on Yost's behalf. In addition, although Fidler could nonetheless have attempted to compel Syracuse's testimony, we think that it is unlikely that Fidler chose to forego this course of action because of an actual conflict. Rather, it seems more likely that Fidler considered it poor trial strategy to subpoena a peripheral, reluctant and not very credible witness who planned in any event to invoke his Fifth Amendment privilege.

Consequently, for all of these reasons, we hold that the pursuit of Syracuse's testimony did not constitute a plausible alternative trial strategy for Yost. Accordingly, absent that proof, the claim of an actual conflict of interest on the part of appellant's counsel must fail.

### III Was Defendant Otherwise Deprived of Effective Assistance?

Yost raises a second effectiveness of counsel argument. He contends that, even in the absence of an actual conflict of interest, he was still entitled to a new trial because he was otherwise deprived of the effective assistance of counsel.

██ In contrast to a defendant's claim that counsel is burdened by an actual conflict of interest, a convicted defendant's claim that he was generally deprived of the effective assistance of counsel is subject to a more rigorous test. *See Lindstadt v. Keane*, 239 F.3d 191, 198–99 (2d Cir.2001). A defendant who claims that his counsel was generally ineffective is entitled to a new trial if he can demonstrate both that (1) counsel's performance "fell below an objective standard of reasonableness" and that (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052.

Yost alleges here that Fidler's representation was deficient because Fidler failed to: (a) refuse to represent him despite a potential conflict of interest; (b) conduct a proper pre-trial investigation; (c) present a defense; (d) interview witnesses; and (e) pursue or discuss plea possibilities with him.

This contention of generally deficient representation is wholly without merit. To the extent that we assumed that Fidler was burdened by an actual conflict of interest, but nonetheless concluded that the conflict did not occasion any lapse in representation, Yost cannot possibly succeed on a claim that, but for Fidler's potential conflict of interest, there is a reasonable probability that he would have been found not guilty. Next, although appellant goes to great lengths in his submissions to insist that Fidler was his lead trial counsel and that attorney Simels was retained for the sole purpose of assisting with the cross-examination of a single government witness, Yost's arguments identifying alleged shortcomings in Fidler's representation are at the very least disingenuous because the record reveals that attorney Simels *actually tried the entire case*—from opening to closing—and that Simels did so quite well, in the estimation of the judge who presided at the trial, Chief Judge Mukasey.

At any rate, to the extent that it is in any way a tenable position that Fidler was entirely responsible for pre-trial investigation, trial strategy, and the presentation of a defense case, Yost has made only the most conclusory assertions with respect to Fidler's shortcomings and the likely effect of these alleged deficiencies on the jury's verdict.

Moreover, Yost's allegation that Fidler failed to pursue or discuss plea possibilities with him is unavailing. To prevail on this point, Yost must demonstrate a reasonable probability that, but for Fidler's deficiencies, he would have pled guilty. *See Purdy v. United States,* 208 F.3d 41, 49 (2d Cir.2000). Although one of Yost's affidavits alludes to "proffers to the government," Yost does not indicate any unequivocal willingness to plead guilty and his affidavits repeatedly assert his innocence, a position that is obviously incompatible with the suggestion that he would have readily pled guilty. Under these circumstances, Yost has failed to demonstrate the required reasonable probability that, but for Fidler's performance as counsel, he would have pled guilty. The claim that Yost was otherwise deprived of the effective assistance of counsel therefore has a hollow and unpersuasive ring.

## CONCLUSION

We have considered the remaining arguments raised by appellant and find them all to be without merit. Accordingly, for the reasons stated, the judgment of conviction is affirmed.