ADRIAN D. SANTIAGO *v.* COMMISSIONER OF
CORRECTION
(AC 24980)

Lavery, C. J., and Flynn and Bishop, Js.

Argued October 13, 2004—officially released February 22, 2005

*Avery S. Chapman,* for the appellant (petitioner).

*Rita M. Shair,* senior assistant state's attorney, with whom were *Michael Dearington,* state's attorney, and, on the brief, *Carolyn K. Longstreth,* former senior assistant state's attorney, for the appellee (respondent).

*Opinion*

LAVERY, C. J. The petitioner, Adrian D. Santiago, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. He claims on appeal that (1) the court improperly denied him certification for leave to appeal and (2) the denial of his petition for a writ of habeas corpus was improper because his trial counsel was burdened by an actual conflict of interest. Because we conclude that the petitioner's first claim is moot and disagree with the second, we affirm the judgment of the habeas court.

The following facts and procedural history are pertinent. A jury found the petitioner guilty of murder after a trial held in February, 1996. The occurrences underlying his conviction are recounted in our Supreme Court's decision disposing of his first direct appeal:

"On the night of November 1, 1993, the [petitioner] had been drinking beer with Mark Aviles and Joanne Negron, fellow residents of the Willimantic YMCA. At some point, Aviles and the [petitioner] left to purchase

some marijuana. They encountered Fernando Ilarraza, the victim, on West Avenue in Willimantic and he offered to sell them marijuana. The [petitioner] refused to buy from the victim, however, because he believed that he would be cheated. When Aviles and the [petitioner] saw the victim later that evening, the [petitioner] and the victim 'exchanged looks.' The [petitioner] subsequently told Aviles that he intended to shoot the victim. Aviles and the [petitioner] walked to a pay phone where the [petitioner] called a friend who lived in a Willimantic neighborhood called Windham Heights. Aviles heard the [petitioner] tell the friend that he was going to 'do the mission' and that he needed a 'piece' to do it. Aviles and the [petitioner] then walked back to the YMCA. The [petitioner] asked Negron to telephone for a taxi to take him to Windham Heights. He returned with a .22 caliber revolver, which he cleaned and loaded in Negron's apartment. Thereafter, he left wearing a black hat, a full-length black coat, black pants and black boots.

"Shortly before 11 p.m. that evening, a Coventry police officer, having just picked up a prisoner from the Willimantic police department, was traveling on Valley Street in Willimantic. He saw the body of the victim lying in the street, and contacted the Willimantic police. The victim was taken by ambulance to Windham Hospital where he was pronounced dead on arrival. An autopsy revealed that the victim had sustained two gunshot wounds, one behind the right ear and one to the right cheek. The gunshot behind the ear was fired from a distance of less than six inches and had caused the victim's death.

"When the [petitioner] returned that night, Aviles asked him if he had killed the victim and the [petitioner] replied that he had. The next day, Negron confronted the [petitioner] about the shooting. The [petitioner] told her that it was 'something he had to do out of his heart'

and that no one had told him to do it. Aviles met with a Willimantic police officer and reported the information. Thereafter, the [petitioner] was arrested and advised of his Miranda[1] rights. When the officers asked him if he had shot the victim, the [petitioner] responded, "si," and nodded his head affirmatively.

"Yajira Vega, who lived on West Avenue, testified that she had seen the [petitioner] and Aviles walking on West Avenue toward Valley Street. In addition, a taxi driver identified the [petitioner] as the person he had driven from the YMCA to Windham Heights at approximately 9:30 p.m. on November 1. The jury found the [petitioner] guilty of murder. The trial court denied the [petitioner's] motions for a new trial, for acquittal and in arrest of judgment, and rendered judgment in accordance with the jury verdict." State v. Santiago, 245 Conn. 301, 303–305, 715 A.2d 1 (1998).

On initial direct appeal, the petitioner's claims of error largely were rejected. The Supreme Court disagreed with the petitioner's arguments that his waiver of a probable cause hearing was invalid due to the state's failure to disclose exculpatory evidence; see id., 306–13; that he was unconstitutionally deprived of a timely probable cause hearing; see id., 313–16; and that his confession was involuntary. See id., 316–23. The case was remanded, however, for a hearing to conduct further inquiry on the issue of possible juror misconduct. See id., 323–40. After that hearing and a second appeal, the petitioner's conviction was affirmed. State v. Santiago, 252 Conn. 635, 748 A.2d 293 (2000).

On May 6, 2002, the petitioner filed an amended petition for habeas corpus relief, claiming that his trial counsel was ineffective in violation of the petitioner's sixth and fourteenth amendment rights due to, inter alia,

---

[1] See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

an actual conflict of interest.[2] Specifically, the petitioner alleged that his counsel, various members of the Windham public defender's office (office), failed to investigate adequately and to interview possible alternate suspects and to pursue a meritorious defense of third party culpability because those suspects were current or former clients of the office. According to the petition, "all were considered suspects by the police, but were not investigated by counsel for petitioner," and "a third party guilt . . . defense could have been adequately supported had the aforementioned investigation been conducted."

A hearing was held, and three attorneys from the office testified as to their representation of the petitioner before and during his trial. Through their testimony and the introduction of exhibits, the following was conveyed. Ramon J. Canning was the supervisor of the office and the ultimate decision maker; Pamala J. Favreau and Mark Shapera worked for Canning. Favreau was employed by the office until April, 1995, at which time she was replaced by Shapera. The office was small and had a heavy caseload covering several courts. Each attorney there would work on any of the office files as need and availability dictated. The office did not have the resources to segregate cases by attorney or to institute a formal conflict checking procedure. Canning and Favreau represented the petitioner on pretrial matters and during discovery; Shapera represented him during discovery and at trial.[3]

Two other clients of the office, Paul Casanova and Edwin Mendez, were among the group of people who in some way were involved with the investigation of the murder of Ilarraza. A third such individual, Ray

[2] The petitioner also raised claims of ineffective assistance as to his counsel for both of his direct appeals. Those claims are not subjects of this appeal.

[3] Another attorney, Matthew Davis, assisted Shapera at trial. Davis did not testify at the habeas hearing.

Soto, was alleged but not shown to be a public defender client. Casanova, for some time, was represented concurrently with the petitioner, although on an unrelated charge.[4] Mendez was a former client, also on an unrelated matter, and briefly was represented concurrently with the petitioner when Mendez violated his probation.[5] Neither Casanova, Mendez nor Soto ever were arrested or charged with anything in connection with the murder.

The petitioner was arraigned and charged with murder on November 4, 1993. On February 16, 1994, on the advice of the office, the petitioner waived a hearing in probable cause. The state had made its witnesses, Aviles and Negron, available to the office, and the office investigator, Ray Condon, interviewed them. The office made a strategic decision to waive the hearing because they viewed Aviles and Negron as transient, i.e., if there were no hearing and the two witnesses thereafter left the area, their testimony would not be preserved in the record.

Favreau testified that at the time of the waiver, the office probably was unaware that it was representing Casanova, although it considered him a possible wit-

---

[4] The court, citing a stipulated trial exhibit summarizing arrest and representation records for Casanova, Mendez and Soto, found that Casanova was represented by the office several times in the period spanning 1990 to 1993. That exhibit reflects that the last representation was in connection with a charge of assault in the third degree, on which Casanova was arrested six days before the petitioner's arraignment on November 4, 1993. That charge was disposed of on March 8, 1994. The court noted these events in its memorandum of decision. The exhibit also shows that although Casanova was arrested five more times between May 2, 1994, and June 22, 2001, he was not represented by the office on any of those charges.

[5] The court, presumably relying on the same exhibit, found that the office represented Mendez from 1990 through 1999. The exhibit shows that Mendez was convicted of larceny in the second degree on September 21, 1993. He violated his probation on August 10, 1994, and that violation was disposed of on February 7, 1995. Thereafter, the office did not represent him again until 1999, well after the conclusion of the petitioner's trial.

ness for the defense. She did not then consider the petitioner's and Casanova's interests to be adverse. When asked whether the advice to the petitioner to waive the hearing was "influenced in any way by [her] relationship as attorney to Soto, Mendez and Casanova," Favreau answered, "No."

During discovery in the petitioner's case, the relationship between the prosecution and the defense apparently was something less than cooperative. The prosecution sought a protective order for its file, which Favreau opposed. Ultimately, on September 2, 1994, the trial court ordered the state to disclose material from its file. The disclosed material included (1) a police report of a complaint made by two women, ten days prior to the murder, that Casanova had threatened to shoot the victim, (2) a police report of an interview with Mendez in which he recounted Soto's purported confession[6] and relayed a street rumor that connected Soto with the gun that was used in the shooting,[7] (3) a police report of an interview with Soto in which he stated that the victim was nothing but trouble, indicated that he had fought with the victim two to three weeks prior to the murder and gave an alibi for the night of the murder, (4) a statement taken from the victim's girlfriend in which she claimed that he had in the recent past fought with Soto, Mendez and the petitioner, and that Mendez had been looking for the victim on the night of the murder, asking about a bicycle[8] and looking

---

[6] Mendez reported that Soto had approached him at an alternative incarceration plan office and stated, "I did it," which statement Mendez interpreted as referring to the murder of Ilarraza. According to the report, Soto did not say anything else.

[7] Mendez also had provided similar information to Favreau in an affidavit dated August 1, 1994. On August 17, 1994, Casanova, too, provided an affidavit to Favreau, stating that Soto had fought with Ilarraza one week before he was killed. Neither affidavit was executed during the time the affiant was being represented by the office.

[8] A disinterested witness to the murder reported that the victim had been riding a bicycle and indicated that the killer had absconded with the bicycle. *State* v. *Santiago*, supra, 245 Conn. 307–308.

nervous, and (5) a statement of a security guard at a school attended by the victim's nephew in which the guard recounted the nephew's telling him that five people were in a car when the murder occurred, including two girls, Mendez, the petitioner and an unknown male, and that the petitioner had shot the victim because Soto wanted him killed.[9]

After receiving the foregoing information from the state's file, Favreau believed there was a conflict and that Casanova needed to be investigated. Favreau did not consider the information pertaining to Mendez to be as significant.[10] She immediately alerted Canning to the circumstances. Thereafter, she stopped working substantively on the case.[11] About six months later, Favreau resigned from the office; she ultimately ceased working there in April, 1995. When asked whether, between September 2, 1994, and the time she left the office, she did anything in the petitioner's case that would benefit Casanova or Mendez, Favreau answered, "No."

Canning believed that the information raised a possible conflict that would need to be investigated. According to Canning, given the nature of the office and its clientele, it often was presented with potential conflicts, so it would look continuously throughout a case to see if any developed into actual conflicts. He testified that immediately after the disclosure of the material from the state's file, Condon, the office investi-

[9] In ordering the information disclosed, the trial judge noted that the victim's nephew had been interviewed and stated that the source of his information had been a Ouija board.

[10] Favreau could not recall precisely why the information regarding Mendez seemed insignificant, but believed that she possibly possessed other information that made him an implausible suspect.

[11] Favreau appeared in court and requested continuances in the petitioner's case on September 30, 1994, and January 6 and February 17, 1995. Otherwise, according to Favreau, she "stopped doing anything on the case other than referring it to [Canning] until he figured out what to do with it."

gator, was sent out. Condon investigated Casanova and was unable to document anything. He attempted to develop evidence that could support a third party culpability defense, but was unsuccessful. Canning testified that every possible lead was pursued through the petitioner's trial. Canning did not believe that the situation ever developed beyond a potential conflict. He offered that rumors circulating did not produce an actual conflict in a public defender's office and that other clients' names constantly came up in case files.[12] In his view, if that automatically were to give rise to an actual conflict of interest, the office would have to shut down.

Canning testified that the office's representation of the petitioner at the time of the probable cause hearing waiver was not influenced in any way by the office's relationship with Casanova, Mendez or Soto. He testified further that from the time of the disclosure of the information from the state's file through the petitioner's trial in 1996, neither he nor any of the other attorneys in the office did or refrained from doing anything in the representation of the petitioner in order to advance or to protect the interests of the other three individuals.

Shapera assumed the representation of the petitioner in the summer of 1995. Shapera was familiar with the information that had been disclosed from the state's file. He stated that the office had investigated the allegations pertaining to Mendez and the bicycle, and determined that they had no significance. Shapera testified further that the office had investigated the information it had received about Casanova, but did not find anything connecting him to the crime. The office also followed up on Mendez's allegation that Soto had confessed to the shooting, but found no evidence that was strong enough

---

[12] Canning testified that "[e]very police report that I read has the name of other defendants in it, either prior representation or even current people that I represent."

to present. Shapera confirmed that the office had investigated and verified Soto's alibi by interviewing his girlfriend. Shapera testified that during his representation of the petitioner, he did not do anything to advance the interests of Casanova, Soto or Mendez and did not hold back on his investigation in order to protect those three individuals.

Shapera testified as to the strategy chosen for the petitioner's trial. According to Shapera, he considered but ultimately did not pursue third party culpability or alibi defenses due to lack of supporting evidence and the existence of significant countervailing evidence. With the approval of the petitioner, he instead pursued a defense strategy focusing on inconsistencies in and weakness of the state's evidence. Shapera testified that his decision as to the defense strategy was not affected in any way by the office's representation of Casanova or Mendez. The petitioner was convicted on February 27, 1996, and on May 23, 1996, was sentenced to fifty years imprisonment.

In its memorandum of decision, the habeas court summarized the procedural history of the case and the testimony adduced at the habeas hearing. It noted that the petitioner framed the issue as one of actual, rather than potential, conflict of interest, and the court outlined the law governing that issue. It found that Soto was not an office client, but that Casanova and Mendez were. The court cited Favreau's testimony that she considered Casanova to be a possible witness for the defense and that prior to disclosure of the information from the state's file, she had not viewed Casanova's interests as different from those of the petitioner. The court found that Favreau was not aware until that disclosure on September 2, 1994, that Casanova had threatened to shoot the victim. The court noted Favreau's testimony that her advice to the petitioner to waive the hearing in probable cause was not influenced in any way

by her relationships with Soto, Mendez and Casanova. It found that she had not worked substantively on the petitioner's case "from September 2, 1994, to April, 1995 . . . ."

The court recounted Canning's statements that he believed Casanova presented a possible conflict that was investigated timely and continuously by the office, but never was established to be anything beyond potential. The court found that the office also investigated Soto, "who was not the [public defender's] client," and did all it could to develop a third party culpability defense. The court noted Canning's testimony that the petitioner's representation was in no way compromised as to his waiver of the hearing in probable cause and that "[n]othing was done in the [public defender's] office to protect the interests of the other three named individuals."

The court summarized Shapera's testimony, in particular his stated belief that a third party culpability defense would have been problematic due to weak evidentiary support and other contrary evidence implicating the petitioner. It found that Shapera "never held back on his investigation of Casanova, Soto or Mendez," and that the office's representation of Casanova and Mendez did not affect Shapera's trial strategy to forgo a third party culpability defense, which strategy the petitioner had approved.

The court also reiterated expert testimony presented by the parties. It cited rules that the expert for the respondent, the commissioner of correction, had considered applicable and the adoption of those rules by the Superior Court. The court noted the expert's testimony distinguishing between actual and potential conflicts, and his opinion that the former, absent consent by the clients, required the attorney to withdraw from representation while the latter required further investigation.

The court also cited the expert's opinion that it is not inappropriate to "attack" a former client on a subsequent matter unrelated to that client's representation unless information learned during the representation is utilized. The court noted that the expert considered the information about Casanova and Mendez to present potential rather than actual conflicts.

After considering all the evidence, the court concluded that the situation faced by the office during its representation of the petitioner was a potential conflict that never rose to the level of an actual conflict. It found that the office had not acted unethically in its representation of the petitioner. The court rejected the petitioner's argument that an alternative, third party culpability defense *"was inherently in conflict with or not undertaken due to the attorney's other loyalties or interest"*; (emphasis in original); and found, rather, that such defense was not pursued because the evidence in support thereof was not strong. It concluded that because "there [was] no showing . . . that counsel represented actual conflicting interests and that counsel's performance was adversely affected," the applicable legal standard had not been satisfied. Accordingly, the court denied the petition.

## I

The petitioner claims first that the court improperly declined to grant him certification to appeal from the denial of his petition because in so doing, it relied on case law that subsequently was overturned. We need not address that claim because it is moot.

The following additional procedural history is relevant. After the court denied the petition for a writ of habeas corpus on October 27, 2003, the petitioner filed motions for reargument and a new trial. Both motions were denied on November 12, 2003. Thereafter, the petitioner requested certification to appeal from the

denial of his petition. Although the request was untimely; see General Statutes § 52-470 (b); the petitioner explained therein that there had been a delay in his receipt of the court's November 12, 2003 rulings. The court denied the petitioner's request, citing *Iovieno* v. *Commissioner of Correction*, 222 Conn. 254, 258, 608 A.2d 1174 (1992), overruled, 242 Conn. 689, 700, 699 A.2d 1003 (1997) (en banc), for the proposition that it lacked discretion to grant an untimely request for certification. The petitioner then renewed his request for certification to appeal, again explaining the reason for his untimeliness and noting that *Iovieno* had been overruled.[13] He filed this appeal contemporaneously with the renewed request for certification. On February 5, 2004, about eight months prior to oral argument in this matter, the court granted the renewed petition for certification to appeal.

"Mootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction . . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *Sweeney* v. *Sweeney*, 271 Conn. 193, 201, 856 A.2d 997 (2004).

Because the court, during the pendency of this appeal, granted the renewed petition for certification to appeal, the issue no longer presents an actual controversy that, if resolved in the petitioner's favor, would result in his obtaining any practical relief. Accordingly, the claim is moot.

---

[13] In that regard, the petitioner is correct. See *Iovieno* v. *Commissioner of Correction*, 242 Conn. 689, 700, 699 A.2d 1003 (1997) (en banc).

## II

The petitioner next argues that "[b]ecause trial counsel and the public defender had represented and continued to represent both Paul Casanova and Edwin Mendez while representing [the petitioner], trial counsel was burdened by an actual conflict of interest at trial." He claims that the office's awareness of the conflict precluded it from conducting an adequate investigation of Casanova, Mendez and Soto, and that the office's conflicting loyalties prevented it from presenting the plausible alternative defense theory of third party culpability. According to the petitioner, representation of conflicting interests is per se ineffective, and the record and case law demonstrate that his trial counsel were laboring under an actual conflict. We disagree.

"Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Goodrum* v. *Commissioner of Correction*, 63 Conn. App. 297, 299, 776 A.2d 461, cert. denied, 258 Conn. 902, 782 A.2d 136 (2001).

"The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment, and article first, § 8, of the Connecticut constitution, guarantee to a criminal defendant the right to effective assistance of counsel. *Powell* v. *Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *Festo* v. *Luckart*, 191 Conn. 622, 626, 469 A.2d 1181 (1983). Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.

*Wood* v. *Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981)." (Internal quotation marks omitted.) *State* v. *Parrott*, 262 Conn. 276, 286, 811 A.2d 705 (2003), quoting *State* v. *Crespo*, 246 Conn. 665, 685–86, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). The right attaches at trial as well as at all critical stages of a criminal proceeding, including a hearing in probable cause. See *State* v. *Gaines*, 257 Conn. 695, 706–707, 778 A.2d 919 (2001).

"Cases involving conflicts of interest usually arise in the context of representation of multiple codefendants by one attorney where the attorney adduces evidence or advances arguments on behalf of one defendant that are damaging to the interests of the other defendant. . . . A conflict of interest also arises [however] if trial counsel simultaneously represents the defendant and another individual associated with the incident and that representation inhibits counsel's ability to represent the defendant." (Internal quotation marks omitted.) *Goodrum* v. *Commissioner of Correction*, supra, 63 Conn. App. 317; see also *State* v. *Martin*, 201 Conn. 74, 80–81, 513 A.2d 116 (1986) (enumerating various types of conflicts).

"In a case of a claimed [actual] conflict of interest . . . in order to establish a violation of the sixth amendment the [petitioner] has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance." (Internal quotation marks omitted.) *State* v. *Parrott*, supra, 262 Conn. 287, quoting *State* v. *Crespo*, supra, 246 Conn. 689; *Goodrum* v. *Commissioner of Correction*, supra, 63 Conn. App. 316–17.[14]

---

[14] The test for ineffective assistance due to an *actual* conflict differs from that for ineffective assistance claims generally, which require a showing of prejudice. See *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). When only a *potential* conflict is established,

"The [United States Court of Appeals for the Second Circuit] has honed this test further. Once a [petitioner] has established that there is an actual conflict, he must show that a lapse of representation . . . resulted from the conflict. . . . To prove a lapse of representation, a [petitioner] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 387, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002), quoting *United States* v. *Stantini*, 85 F.3d 9, 16 (2d Cir.), cert. denied sub nom. *Bisaccia* v. *United States*, 519 U.S. 1000, 117 S. Ct. 498, 136 L. Ed. 2d 390 (1996). Nevertheless, no lapse of representation should be found to have occurred when a foregone strategy or tactic either is against the petitioner's interest or is "so insubstantial that even the most ardent and talented, conflict-free advocate would likely have avoided it." *United States* v. *Malpiedi*, 62 F.3d 465, 469 (2d Cir. 1995). In short, the alleged foregone strategy must possess "sufficient substance to be a viable alternative." (Internal quotation marks omitted.) *United States* v. *Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003).

"We have had occasion to point out the caution from the United States Supreme Court that the *possibility* of conflict is insufficient to impugn a criminal conviction. . . . *Cuyler* v. *Sullivan*, [446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)]. To demonstrate an actual conflict of interest, the petitioner must be able to point to *specific instances* in the record which suggest impairment or compromise of his interests for the benefit of another party." (Emphasis in original; internal quotation marks omitted.) *Goodrum* v. *Commissioner*

---

however, the general test applies and resultant prejudice must be proven. *United States* v. *Williams*, 372 F.3d 96, 102–103 (2d Cir. 2004).

*of Correction,* supra, 63 Conn. App. 318. A "mere theoretical division of loyalties" is not enough. (Internal quotation marks omitted.) *United States* v. *Feyrer,* supra, 333 F.3d 116.

To begin, it is clear that as to Soto, the court's conclusion that no actual conflict existed is legally correct. Insofar as the petitioner did not present any evidence at the habeas hearing to establish that Soto ever was a client of the office, it necessarily follows that the office could not have " 'actively represented conflicting interests' "; *State* v. *Parrott,* supra, 262 Conn. 287; by representing both Soto and the petitioner. Accordingly, any claimed deficiency in the investigation of Soto's purported involvement in the murder could not have been due to counsel's divided loyalties. Furthermore, the fact that Soto was implicated by an office client, Mendez, does not create an actual conflict. See *State* v. *Cator,* 256 Conn. 785, 796, 781 A.2d 285 (2001) (no actual conflict when codefendants represented by same counsel did not attempt to implicate each other, but rather one identified third party as perpetrator of crime).

As to the other two allegedly viable alternate suspects, the timing of the representation of each is "relevant for purposes of establishing the existence of an actual conflict." *State* v. *Gaines,* supra, 257 Conn. 712. To reiterate, the office was representing Casanova on an unrelated assault charge at the time of the petitioner's arraignment and at the time the petitioner waived the hearing in probable cause, but that charge was disposed of on March 8, 1994, almost two years prior to the petitioner's February, 1996 trial. The office did not represent Casanova thereafter.

The court credited Favreau's testimony that at the time she advised the petitioner to waive the hearing in probable cause, she was unaware that Casanova had

threatened the victim and that she became aware of the threat only with the disclosure ordered from the state's file several months later. The court concluded that the situation presented only a potential conflict. We agree with that conclusion.

The dynamic is similar to one presented in *Walton* v. *Commissioner of Correction*, 57 Conn. App. 511, 749 A.2d 666, cert. denied, 254 Conn. 913, 759 A.2d 509 (2000). In that case, the petitioner argued that his counsel, a public defender, labored under an impermissible conflict of interest because counsel's office also represented an individual whom the petitioner claimed had coerced him into committing the crimes with which he was charged. Id., 515. We rejected that argument because the identity of that individual was not known during the course of the petitioner's trial and surfaced only after his sentencing. Id., 516. In that circumstance, we found it "difficult to imagine how the attorney's duty of undivided loyalty to his client was compromised or how the petitioner's representation was jeopardized in any way." Id., 517. In short, for counsel to represent actively conflicting interests and for the representation to be affected adversely, counsel necessarily must be aware that a conflict exists.

In this case, although Casanova was a client of the office at the time it advised the petitioner to waive a hearing in probable cause, the office had no reason at that time to believe that the petitioner's and Casanova's interests possibly were adverse. Rather, at that stage of the proceedings, Casanova was considered to be only a potential defense witness.[15] As such, it is hard to

---

[15] Impermissible conflicts can arise when counsel represents both a criminal defendant and a witness to the crime alleged. That typically occurs, however, when the witness is one for the state, rather than the defense, such that defense counsel is put in the position of having to cross-examine his or her client, possibly using confidential information learned in the course of the representation. See, e.g., *State* v. *Crocker*, 83 Conn. App. 615, 627, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004); *Ciak* v.

conceive how counsel's loyalty to the petitioner was compromised in favor of allegiance to Casanova. "[I]t is not representation of more than one client which deprives a defendant of his constitutional right to effective assistance of counsel, it is representation of *clients with adverse interests*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Cator*, supra, 256 Conn. 794, quoting *State* v. *Henton*, 50 Conn. App. 521, 527, 720 A.2d 517, cert. denied, 247 Conn. 945, 723 A.2d 322 (1998). Moreover, both Favreau and Canning testified that the petitioner's representation as to the hearing in probable cause was not affected by any duty to Casanova, and the court credited their testimony. This court will not revisit credibility determinations. *State* v. *Griffin*, 78 Conn. App. 646, 651, 828 A.2d 651 (2003).

Regarding Mendez, the court found that the office represented him on an unrelated larceny charge that was disposed of on September 21, 2003, more than one month prior to the petitioner's arrest and arraignment. Mendez became an active client again on August 10, 1994, due to a violation of probation; that violation was disposed of on February 7, 1995. The office did not represent Mendez again until April, 1999. Thus, although the petitioner and Mendez were represented concurrently for a time, it was well after the time the petitioner waived the hearing in probable cause and well before the petitioner's February, 1996 trial. After the disclosure of the information from the state's file on September 2, 1994, which potentially implicated Mendez, Favreau stopped working substantively on the petitioner's case and ceased working for the office in April, 1995. She testified that during that period, she did nothing in the petitioner's case to benefit Mendez, and the court, in finding that "[n]othing was done in the [public defender's] office to protect the interests of the other three

*United States*, 59 F.3d 296, 305–306 (2d Cir. 1995). Here, there is no evidence showing that counsel was placed in such a position.

named individuals," necessarily credited her testimony. Given that this brief period of corepresentation of the petitioner and Mendez was on wholly unrelated matters and, as to the petitioner's case, nothing occurred aside from Favreau's requesting of continuances, we conclude that the court's finding that there was no active representation of conflicting interests, as to that period, was legally correct.

During the remaining time that the office represented the petitioner, Casanova and Mendez merely were former clients of the office and, pursuant to the opinion of the ethics expert cited by the court,[16] the office was free to attempt to implicate them in matters unrelated to their representation as long as it did not use privileged information learned during the course of their representation.[17] According to the testimony of Condon and

---

[16] The expert's opinion in that regard accurately reflects rule 1.9 of the Rules of Professional Conduct, which provides: "A lawyer who has formerly represented a client in a matter shall not thereafter: (1) Represent another person *in the same or a substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or (2) Use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known." (Emphasis added.)

Here, the matters on which Casanova and Mendez were represented were wholly unrelated to the petitioner's case. Further, the information suggesting that they should be investigated was not learned by the office in conjunction with its representation of them, but rather came to light when the court ordered disclosure from the state's file.

[17] Federal case law interpreting the sixth amendment is in accord. "[I]n a successive representation case, mere proof that a criminal defendant's counsel previously represented a witness is insufficient to establish 'inconsistent interests.' In such a context, if defendant fails to show that either (1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case, then defendant has not come even close to showing 'inconsistent interests.' " *Smith* v. *White*, 815 F.2d 1401, 1405–1406 (11th Cir.), cert. denied, 484 U.S. 863, 108 S. Ct. 181, 98 L. Ed. 2d 133 (1987).

Shapera, which the court found credible, that is precisely what the office did. Relying on that testimony, the court properly concluded that the situation never progressed beyond being a potential conflict.

"[A] client's representation suffers from a *potential* conflict of interest if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." (Emphasis in original; internal quotation marks omitted.) *United States* v. *Williams*, 372 F.3d 96, 102 (2d Cir. 2004). That is all that was proven in this case. The office became privy to information that, if it led to the discovery of evidence of third party culpability, could have put counsel, at some future time, in the position of accusing one client of wrongdoing to the end of protecting another client charged with that wrongdoing. Because the office, despite its efforts, was unable to develop any further evidence implicating Casanova or Mendez in the murder of Ilarraza, the potential conflict never ripened into an actual conflict. The petitioner, thus, raised a " 'mere theoretical division of loyalties' "; *United States* v. *Feyrer*, supra, 333 F.3d 116; that is insufficient to impugn his criminal conviction.

As to the petitioner's argument that the office should have pursued a third party culpability defense, pursuant to the test articulated by the Second Circuit in *Stantini* and *Feyrer*, to amount to an unconstitutional lapse in representation, an alternative defense not undertaken must be "plausible" and "viable," as well as in conflict with counsel's other interests. We have in the past rejected a habeas petitioner's allegations that counsel was conflicted due to simultaneous representation, on an unrelated charge, of a potential witness and alleged alternate suspect. See *Dunkley* v. *Commissioner of Correction*, 73 Conn. App. 819, 828–29, 810 A.2d 281 (2002), cert. denied, 262 Conn. 953, 818 A.2d 780 (2003). In that case, the evidence adduced at the habeas hearing did not link the alleged suspect to the petitioner's crime

and did not show that counsel's performance as attorney for the petitioner was in any way affected by the joint representation. Id., 828. This case is similar.

Here, the evidence adduced at the habeas hearing consisted, in relevant part, of statements that Casanova had threatened the victim ten days before the murder, that Mendez had fought with the victim, and that Mendez was looking for the victim and asking about a bicycle on the night of the murder.[18] Although the police took those statements, no arrests resulted, presumably because they did not lead to anything directly connecting Casanova and Mendez with the murder. Without more, none of those statements contain sufficient substance to support a viable third party culpability defense, particularly when taken in conjunction with the considerable evidence that instead implicated the petitioner.

"[A] defendant may introduce evidence which indicates that a third party, and not the defendant, committed the crime with which the defendant is charged. . . . The defendant, however, must show some evidence which directly connects a third party to the crime with which the defendant is charged . . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citations omitted.) State v. Echols, 203 Conn. 385, 392, 524 A.2d 1143 (1987). Evidence that a murder victim and a third party had argued shortly before the victim was killed, without

---

[18] As explained previously, the information pertaining to Soto is not pertinent because it was not established that he was a client of the office. Regarding the statement of the security guard placing Mendez at the scene of the murder, the petitioner did not press its relevance in his appellate brief. That likely is due to the fact that the statement also identifies the petitioner as the shooter and, as noted by the trial judge in ordering its disclosure, it appears to have questionable underpinnings. See footnote 9.

more, is insufficient to be admissible under *Echols*. See *State* v. *Boles*, 223 Conn. 535, 548–49, 613 A.2d 770 (1992).

Shapera testified that with the approval of the petitioner, he did not pursue a third party culpability defense because despite the office's investigatory efforts, the supporting evidence was weak[19] and was contrary to other evidence. The court credited Shapera's testimony, and it is not this court's role to second guess that credibility determination.[20] *State* v. *Griffin*, supra, 78 Conn. App. 651. Under the circumstances, we agree with the court's conclusion that the office's failure to pursue a third party culpability defense did not result from an actual conflict of interest that adversely affected counsel's performance. See *United States* v. *Feyrer*, supra, 333 F.3d 118–19 (finding alleged foregone defense not plausible when supporting evidence problematic and concluding that counsel likely considered it poor trial strategy); see also 3 W. LaFave, J. Israel & N. King, Criminal Procedure (2d Ed. 1999) § 11.9 (d), p. 699 ("to establish an adverse impact through the inherent conflict of a strategy not undertaken, the court must be able to find that the conflict actually does explain that failure; the conflicting character of the strategy will not be sufficient if the strategy actually was rejected because another strategy was even more favorable to the accused"). It simply is not ineffective assistance of counsel to decline to pursue a third party

---

[19] At the habeas hearing, Shapera testified that during the petitioner's trial, the state filed a motion in limine to preclude the defense from introducing evidence as to third party culpability unless it met the standard of *Echols*. Shapera believed there was a possibility of satisfying that standard, but only in regard to Soto.

[20] In determining whether counsel's performance was adversely affected by an actual conflict of interest, counsel's testimony regarding the reasons for his or her trial strategy is wholly proper evidence to be considered and credited by the court. See *Burger* v. *Kemp*, 483 U.S. 776, 785–86, 790–92, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987).

culpability defense when there is insufficient evidence to support that defense. *Dunkley* v. *Commissioner of Correction*, supra, 73 Conn. App. 827.

To summarize, as the findings of the court are supported by the testimony and evidence presented at the hearing, they are not clearly erroneous. Because those findings demonstrate that the office faced only a potential conflict of interest, the court's conclusion that the petitioner was not deprived of his constitutional right to effective assistance of counsel due to an actual conflict was legally correct.

The judgment is affirmed.

In this opinion the other judges concurred.