******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# NICHOLAS J. PAPANTONIOU *v.* COMMISSIONER OF CORRECTION
## (AC 46189)

Elgo, Seeley and Bishop, Js.

### *Syllabus*

The respondent Commissioner of Correction appealed, on the granting of certification, from the habeas court's judgment granting in part the petitioner's petition for a writ of habeas corpus after concluding that the petitioner's sixth amendment right to the effective assistance of counsel had been violated due to an undisclosed, actual conflict of interest on the part of his criminal defense counsel, G. The respondent claimed, inter alia, that the court improperly concluded that the petitioner had established that G was burdened by an actual conflict of interest that adversely affected his representation of the petitioner. *Held*:

The habeas court's finding that G simultaneously represented both the petitioner at the time of the petitioner's criminal trial and S, a witness who testified on behalf of the state at the petitioner's criminal trial, was clearly erroneous, as it was undisputed that another attorney filed an appearance in place of G in S's criminal case before the commencement of the petitioner's criminal trial, and, thereafter, G did not file any appearances on behalf of S at any time prior to the conclusion of the petitioner's trial or his sentencing, nor was there any documentary or testimonial evidence in the record that G provided legal representation to S in any court proceeding or otherwise at the time of the petitioner's criminal trial.

The habeas court's finding that G represented S at a hearing six weeks prior to the start of the petitioner's criminal trial was clearly erroneous, as the relevant court files, considered in tandem with the unequivocal statements that S's defense counsel had filed an appearance in the unrelated criminal case, which were included in conflicting transcripts from that hearing, convinced this court that a mistake had been made regarding G's alleged representation of S at the hearing in question.

The habeas court improperly concluded that G's representation of S and the petitioner for four months prior to the start of the petitioner's criminal trial created a conflict of interest with respect to G's representation of the petitioner in his criminal trial, as this court, having considered the facts of this case under the multifactored analysis set forth in *State* v. *Davis* (344 Conn. 122), concluded that there was no evidence that G's simultaneous representation of S and the petitioner in the early stages of the petitioner's criminal trial and S's unrelated criminal case was anything other than transient and insubstantial.

Even if this court were to conclude that a conflict of interest existed, the petitioner failed to satisfy his burden of demonstrating that the conflict of interest adversely affected G's representation of the petitioner, as G's failure to use S's prior convictions and pending cases to attack his credibility at trial actually demonstrated that G was acting in the petitioner's best interest with respect to S, who was the only witness to corroborate the petitioner's account of what transpired the night of the murder.

The habeas court improperly determined that the petitioner's sixth amendment right to the effective assistance of counsel was violated by G's failure to notify the petitioner in writing of his prior representation of S pursuant to rule 1.7 of the Rules of Professional Conduct, as a party must demonstrate that an actual conflict of interest adversely affected his attorney's performance, and proof that an attorney violated rule 1.7 was not sufficient to establish a violation of a client's sixth amendment right to the effective assistance of counsel.

Argued May 23, 2024—officially released October 14, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *M. Murphy, J.*; judgment granting the petition in part, from which the respondent, on the granting of certification, appealed to this court. *Reversed in part*; *judgment directed*.

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Craig P. Nowak*, supervisory assistant state's attorney, for the appellant (respondent).

*Vishal Garg*, assigned counsel, for the appellee (petitioner).

*Opinion*

ELGO, J. The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting in part the petition for a writ of habeas corpus filed by the petitioner, Nicholas J. Papantoniou. The court granted the petition after concluding that the petitioner's sixth amendment right to effective assistance of counsel was violated due to an undisclosed, actual

conflict of interest on the part of his criminal trial counsel, Attorney Glenn Conway. On appeal, the respondent claims that the court (1) erroneously found that Conway simultaneously represented the petitioner and James Samperi, Jr., a witness who testified on behalf of the state, at or near the time of the petitioner's criminal trial, and (2) improperly concluded that the petitioner had established that Conway was burdened by an actual conflict of interest that adversely affected his representation of the petitioner at the petitioner's criminal trial. We agree and, accordingly, reverse in part the judgment of the habeas court. See footnote 2 of this opinion.

The following facts underlying the petitioner's criminal conviction were set forth in his direct appeal. "At approximately 12:30 p.m. on October 19, 2014, William Coutermash drove to 397 Circular Avenue in Hamden; the [petitioner] accompanied him. Larry Dildy, the victim, lived in the second floor apartment of a multifamily house located at 397 Circular Avenue with his wife, Vivian Dildy (Vivian), and their daughter, Ashante Dildy (Ashante). The victim was a known drug dealer, and according to Coutermash, he and the [petitioner] went to the victim's apartment with the intent to rob him. More specifically, Coutermash said the plan was to 'flash a gun in the [victim's] face' in an attempt to 'get either drugs or money' from him.

"When Coutermash and the [petitioner] arrived, Coutermash parked his vehicle—a black Jeep with New York license plates—near the victim's driveway and handed the [petitioner] gloves and a handgun. According to Coutermash, the [petitioner] then exited the vehicle 'to get drugs or money' and also was armed with a knife. The [petitioner], who was wearing a gray sweatshirt, a tan hat, and sunglasses, then proceeded to the back door of the victim's apartment. Coutermash testified that he stayed in his Jeep.

"Vivian was home at the time, and according to her, one 'intruder' entered the apartment through the apartment's locked back door after the force of his knocking opened it. She described the intruder as wearing a grey 'sweat jacket' and a yellow or beige hat. Shortly thereafter, Vivian saw the lone intruder pointing a gun at the victim, heard him say something that 'sounded like give it up,' and called 911 at her husband's request. Ashante, who was hiding in her room when the intruder entered the apartment, also heard a single, 'raspy' male voice say that 'he needed the $400 and the pill,' and overheard her father respond that '[he] didn't have it.' After the victim and the intruder argued for a period of time, a physical fight ensued, and the two men struggled over the intruder's gun. During the struggle, the victim pulled off the intruder's sweatshirt, and Vivian struck the intruder over the head with a broom handle before she ran to a separate room. Vivian then heard two gunshots, and the intruder quickly fled the apartment.

"Minutes after the [petitioner] had exited the Jeep, Coutermash observed emergency personnel arriving and decided to drive away from the area. As he did so, he encountered the [petitioner] on a nearby street, picked him up, and the two left the scene. The victim had been shot, cut, and stabbed multiple times during the altercation; he was taken to a hospital and died from his injuries.

"During the ensuing police investigation, investigators recovered various items located on the floor near the victim's body, including a grey hooded sweatshirt, a tan hat, sunglasses, and a knife. Subsequent scientific testing revealed that DNA evidence taken from the grey sweatshirt matched the [petitioner's] DNA profile, which was contained in a national database of DNA. That same testing eliminated Coutermash as a source of the DNA found on the grey sweatshirt. Scientific testing of the tan hat also revealed the presence of

both the [petitioner's] and the victim's DNA. Finally, surveillance cameras near the victim's apartment captured the [petitioner] discarding gloves and a handgun shortly after the shooting." (Footnotes omitted.) *State v. Papantoniou*, 185 Conn. App. 93, 96–98, 196 A.3d 839, cert. denied, 330 Conn. 948, 196 A.3d 326 (2018). The state thereafter charged the petitioner, by way of an amended long form information, with felony murder in violation of General Statutes § 53a-54c, burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), and criminal possession of a firearm in violation of General Statutes (Rev. to 2013) § 53a-217 (a) (1). At his criminal trial, "[t]he [petitioner] testified . . . and was the final witness called by the defense. His testimony, in certain respects, conflicted with Coutermash's testimony. According to Coutermash, the victim did not owe him money, and he remained in his Jeep when the [petitioner] went to the victim's apartment. The [petitioner] testified that, on October 19, 2014, Coutermash told him that he needed to 'collect some money' from someone. . . . In contrast to Coutermash, the [petitioner] claimed that when he and Coutermash arrived at 397 Circular Avenue, both of them entered the victim's apartment, and Coutermash demanded $400 from the victim. The [petitioner] testified that he entered the victim's apartment only after Coutermash and the victim began fighting and when things were 'getting out of control . . . .' Upon entering the apartment, the [petitioner] told the victim: '[L]isten, just give [Coutermash] his money—you know—let me get the hell out of here, just give him what you owe him, it's gone far enough, it's out of control, just give him his money, you know.' The [petitioner] further testified that, immediately after he told the victim to give Coutermash money, Coutermash fled the apartment. At that point, the [petitioner] claimed that the victim charged at him, the two began to struggle over the gun in his

hand, and the gun 'went off' twice during the struggle." (Citation omitted.) Id., 100–101.

"Additionally, Vivian and Ashante both testified that a lone intruder demanded money and pills from the victim before struggling with and shooting him. According to Vivian, the intruder wore a grey 'sweat jacket' and a yellow or beige hat. DNA evidence found on the grey sweatshirt and tan hat found next to the victim's body directly connected [the petitioner] to the shooting, and [the petitioner] even testified at trial that the gun discharged while he struggled with the victim. . . . All of this is compelling evidence that [the petitioner] was armed with a gun when he unlawfully entered the victim's apartment with the intent to rob the victim and that the victim died as a result of the incident. The state therefore presented a very strong case against the [petitioner]. . . . Moreover, Vivian and Ashante corroborated Coutermash's testimony that [the petitioner] entered the victim's apartment alone with the intent to take either drugs or money from the victim at gunpoint." (Citation omitted.) Id., 105–106.

Samperi testified as a witness on behalf of the state. In his testimony, Samperi stated that another individual, Jason Marini, had had a drug deal go bad with the victim and that Marini "had been plotting on him for a while." Samperi testified that Marini and Coutermash had multiple conversations in his presence about robbing the victim, during which Samperi stated that he wanted nothing to do with it because he was on parole. Samperi testified that the petitioner was not present for those conversations.

Samperi also testified that he spoke to Coutermash the day after the victim's murder. At that time, Coutermash appeared nervous to Samperi and stated that "he had the fight with the guy . . . ." Samperi testified that Coutermash told him that he "fucked up" and

"screwed up bad." On cross-examination, Samperi testified that "[Coutermash] told me that he went [to the victim's residence] to collect a debt, he had the fight with the guy . . . ."

In addition, Samperi testified that, at the time of the victim's murder, he had an extensive knife collection and had given a couple of knives to Coutermash. Samperi identified a photograph of the knife found at the crime scene, which was admitted into evidence at the petitioner's criminal trial, as one that looked like a knife he had given to Coutermash. Samperi also testified that he did not know the petitioner "to carry that knife."

At the conclusion of trial, the jury found the petitioner guilty on all counts.[1] The trial court rendered judgment accordingly and sentenced the petitioner to a term of imprisonment of forty-five years on the felony murder conviction, a concurrent sentence of twenty years of imprisonment on the burglary conviction, and a concurrent sentence of ten years of imprisonment on the criminal possession of a firearm conviction, for a total effective sentence of forty-five years of imprisonment. Id., 98. This court affirmed that judgment of conviction on direct appeal. Id., 118.

The petitioner commenced this habeas corpus action in 2017.[2] In count one of his operative petition, the

---

[1] Coutermash subsequently pleaded guilty, on June 30, 2016, to manslaughter in the first degree as an accessory in violation of General Statutes § 53a-55 (a) (1) and burglary in the first degree as an accessory in violation of § 53a-101 (a) (1), for which he received a total effective sentence of eighteen years of imprisonment, execution suspended after twelve years, and five years of probation.

[2] The petitioner acted in a self-represented capacity when he filed his original habeas corpus petition in June, 2017. He subsequently retained counsel and filed two amended petitions. The operative petition, his October 22, 2021 second amended petition for a writ of habeas corpus, alleged four counts. Counts one and two alleged ineffective assistance of counsel on the part of Conway. The claims set forth in the third and fourth counts of the operative petition—which alleged a *Brady* violation for failure to disclose Samperi's pending cases to defense counsel; see *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); and structural error as

petitioner alleged that "at the time of [the petitioner's criminal] trial . . . Conway was simultaneously representing the petitioner and [Samperi]." The petitioner alternatively alleged that, "[e]ven if [Conway] did not represent Samperi . . . at the time of [his] testimony [at the petitioner's criminal trial], Conway had a substantial and ongoing concurrent conflict of interest with Samperi" due to his representation of Samperi at a January 13, 2016 hearing. The petitioner alleged that "as a result of [Conway's] representation of [Samperi] . . . the petitioner's right to the effective assistance of counsel was violated" due to both Conway's failure to disclose this conflict of interest and his failure to impeach Samperi with either his motives for testifying or his various criminal charges. The petitioner also alleged that he had never been advised of the conflict of interest, much less waived his right to conflict free representation. In the second count of his petition, the petitioner claimed that, even if no conflict of interest existed, Conway rendered ineffective assistance due to his failure to cross-examine Samperi as to his pending criminal case and motive or interest in testifying for the state.

At the three day habeas trial that followed, the petitioner testified and offered copies of various transcripts as evidence. The petitioner also presented the testimony of Samperi, Conway, former prosecutor Gary Nicholson, Supervisory Assistant State's Attorney Amy Bepko, Supervisory Assistant State's Attorney Stacy Miranda, and Assistant State's Attorney Karen Roberg. The respondent submitted two transcripts and a copy of an appearance form into evidence and also called Bepko as a witness. Both parties filed posttrial briefs.

In its memorandum of decision, the habeas court found that the "evidence demonstrates" that Conway

a result of Conway's failure to disclose the conflict—were denied by the habeas court and are not at issue in this appeal.

had represented the petitioner and Samperi "at or near the time of [the petitioner's] criminal trial . . . ." The court also found that, "[e]ven if there were no simultaneous representation of both, then, Samperi was a former and ongoing client who warranted proper disclosure to [the petitioner], opposing counsel, and the trial court." The court continued: "Although Conway viewed Samperi as helpful to the [petitioner's] defense, Samperi also helped the state's case by linking [the petitioner] to Coutermash and Marini, connecting [the petitioner] to a knife, and identifying [the petitioner] in several videos." In addition, the court found that "Samperi was charged in the [weapons] case[3] with a weapons offense related to [a] burglary in Milford involving Marini and Coutermash. Conway represented Samperi in that case at the same time he represented [the petitioner]. Conway could not question Samperi about that conviction, which occurred shortly before [the petitioner's] trial began, without opening the door to the state to explore the connections between Marini, Coutermash, and Samperi." (Footnote added.)

The court further found that Conway was burdened by a conflict of interest that he failed to disclose to the petitioner, the prosecutors, or the court. Citing to rule 1.7 of the Rules of Professional Conduct, the court found that Conway "had a duty to [the petitioner] to disclose his conflict arising from simultaneously representing Samperi. Additionally, Conway had a duty to the court to disclose his conflict so that the court can make a record of the conflict, its disclosure, and determine whether [the petitioner] could consent to continuing with Conway." The court also found that Conway

---

[3] Throughout its memorandum of decision, the habeas court referred to criminal Docket No. CR-15-0088509-T as the "8509 case." We refer to that case in this opinion as the weapons case. The weapons case was resolved shortly before the petitioner's criminal trial commenced. See *State* v. *Samperi*, Superior Court, judicial district of Ansonia-Milford, Docket No. CR-15-0088509-T (January 13, 2016).

"was operating under an impaired duty of loyalty by simultaneously representing [the petitioner] and Samperi" and that "Conway's cross-examination of Samperi intentionally avoided questions that are routinely asked to attack a witness' credibility." The court thus concluded that the petitioner had proven ineffective assistance of counsel on the part of Conway and, accordingly, granted the petition for a writ of habeas corpus with respect to those claims. The respondent subsequently filed a petition for certification to appeal, which the court granted, and this appeal followed.

I

The respondent first claims that the court erroneously found that Conway simultaneously represented the petitioner and Samperi "at or near the time of [the petitioner's] criminal trial."[4] In his operative petition for a writ of habeas corpus, the petitioner alleged that Conway simultaneously represented the petitioner and Samperi "at the time" of the petitioner's criminal trial. The petitioner then alternatively alleged that, "[e]ven if [Conway] did not represent Samperi" at the time of the petitioner's criminal trial, he had represented Samperi at a January 13, 2016 hearing six weeks prior to the start of the petitioner's criminal trial on February 24, 2016. In its memorandum of decision, the court found that Conway had represented the petitioner and Samperi "at *or* near the time of [the petitioner's] criminal trial . . . ." (Emphasis added.) To properly analyze

---

[4] The petitioner argues that this claim is unreviewable because (1) it is unpreserved, (2) the respondent induced any error on the part of the habeas court, and (3) it is inadequately briefed. We do not agree. At the habeas trial, both parties submitted documentary and testimonial evidence regarding the extent of Conway's representation of Samperi, and the respondent on appeal has thoroughly briefed that issue by citing to relevant law and applying it to the present case. Moreover, the respondent specifically argued in his posttrial brief to the habeas court that Conway "was not actively representing conflicting interests between [Samperi] and the petitioner at the time of the petitioner's criminal trial."

the respondent's claim, we consider those two alternative findings independently.

At the outset, we note that we review the factual findings made by the trial court in connection with a sixth amendment ineffective assistance claim pursuant to the clearly erroneous standard. See *State* v. *Davis*, 344 Conn. 122, 132, 277 A.3d 1234 (2022). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 133.

For purposes of clarity, we begin by noting certain facts that are not in dispute and find support in the evidence presented at the habeas trial. In 2014, Samperi was arrested and charged in the weapons case for his role in a May, 2014 burglary in Milford.[5] In March, 2015, Samperi hired Conway to represent him in the weapons case and Conway filed an appearance on his behalf.[6]

---

[5] As the court found in its memorandum of decision, the weapons case related to a burglary that occurred in Milford in 2014, in which Samperi, Coutermash, and Marini all were implicated. As a result of his role in the burglary, which involved the theft of firearms, Coutermash pleaded guilty and was sentenced to one year of incarceration for conspiracy to commit carrying a dangerous weapon in violation of General Statutes §§ 53a-48 and 53-206 on January 15, 2016. On March 4, 2016, Marini also pleaded guilty to charges stemming from the burglary—namely, conspiracy to commit theft of a firearm in violation of General Statutes §§ 53a-48 and 53a-212, conspiracy to commit burglary in the third degree in violation of General Statutes §§ 53a-48 and 53a-103, and conspiracy to commit larceny in the first degree in violation of General Statutes §§ 53a-48 and 53a-122. Marini received a sentence of five years imprisonment, execution suspended after two years, with five years of probation.

Samperi was charged in the weapons case with one count of conspiracy to commit theft of a firearm in violation of §§ 53a-48 and 53a-212. At a plea hearing held on January 8, 2016, Samperi entered a guilty plea, which was vacated on January 13, 2016, due to a technical error. On January 13, 2016, Samperi pleaded guilty to conspiracy to commit carrying a dangerous weapon in violation of General Statutes §§ 53a-48 and 53-206.

[6] At the habeas trial, Conway testified that he met Samperi in March, 2015, and filed an appearance in the weapons case.

At that time, Conway represented the petitioner in the criminal case underlying this habeas action.

When Conway learned that Samperi was a potential witness in the petitioner's criminal trial, Conway told Samperi that he had to withdraw his representation of Samperi.[7] Conway then turned Samperi's case over to Attorney Richard P. Silverstein, who the petitioner concedes "represented Samperi until . . . January of 2016." Silverstein filed an appearance on behalf of Samperi in the weapons case on June 29, 2015. At that time, Silverstein indicated that his appearance was "in place of the appearance" previously filed by Conway.[8]

In December, 2015, Samperi was arrested and charged with certain domestic violence offenses. At some point, Samperi reached out to Conway, who encouraged him to proceed without an attorney and work with family relations to resolve those charges. On February 24, 2016, Samperi was arrested and charged with new domestic related charges, including risk of injury to a child. It is undisputed that Conway did not file appearances or provide legal representation to Samperi in those cases at any time prior to or during the petitioner's criminal trial.[9]

---

[7] At the habeas trial, Conway explained that, although he "never saw [his representation of Samperi] as a conflict," he recognized that it "could . . . have the appearance of a conflict."

[8] In his appellate brief, the petitioner acknowledges that "Conway's representation of Samperi in [the weapons] case ended on or shortly before June 29, 2015."

[9] On January 7, 2017, more than six months after the petitioner was sentenced in the criminal case giving rise to this habeas action, Samperi was arrested on additional criminal charges. Samperi hired Conway to represent him, and Conway subsequently negotiated a global plea offer that resolved all of Samperi's outstanding cases on August 1, 2017, in exchange for a four and one-half year sentence. That representation occurred subsequent to Conway's representation of the petitioner.

At the habeas trial, Samperi testified that Conway had acted as his lawyer in "all" of his cases between 2014 and 2017, with the exception of when Silverstein replaced Conway in the weapons case. The record before us contains evidence that Samperi had a total of four additional cases during that time period: (1) Docket No. A22M-CR-15-0090828-S, which pertained

## A

We begin with the court's finding that Conway simultaneously represented the petitioner and Samperi *at the time* of the petitioner's criminal trial. That issue requires little discussion. It is undisputed that Silverstein filed an appearance "in place of" Conway in the weapons case in June, 2015, and that Conway thereafter did not file any appearances on behalf of Samperi at any time prior to the conclusion of the petitioner's trial or his sentencing in June, 2016. There also is no documentary or testimonial evidence in the record before us that Conway provided legal representation to Samperi in any court proceeding or otherwise at the time of the petitioner's trial.[10] Accordingly, the court's finding that Conway simultaneously represented the petitioner and Samperi at the time of the petitioner's trial is clearly erroneous. See, e.g., *Rose* v. *Commissioner of Correction*, 348 Conn. 333, 344–46, 304 A.3d 431 (2023).

## B

In his operative habeas petition, the petitioner also alleged that Conway represented Samperi at a January

to his December, 2015 arrest on domestic violence offenses; (2) Docket No. A22M-CR-16-0091308-S, which concerned his February, 2016 arrest on new domestic related charges; (3) Docket No. A22M-CR-17-0093295-S, which concerned his January, 2017 arrest on, inter alia, burglary and forgery charges; and (4) Docket No. A22M-CR-17-0094425-S, which pertained to his January, 2017 arrest for violating a protective order, disorderly conduct, and assault in the third degree. To be clear, the undisputed evidence adduced at the habeas trial indicates that, in early 2017, Samperi retained Conway as counsel and Conway, at that time, negotiated a global settlement of those four cases. For that reason, Samperi's testimony that Conway acted as his lawyer in "all" of those cases is consistent with the other evidence presented at trial, which demonstrates that Conway helped Samperi resolve those cases after being retained by Samperi in 2017. There nevertheless is no evidence in the record that Conway filed an appearance or represented Samperi in any of those cases *prior* to the conclusion of the petitioner's criminal trial.

[10] The weapons case was resolved before the petitioner's criminal trial began, as the habeas court found in its memorandum of decision.

13, 2016 proceeding in the weapons case six weeks prior to the start of the petitioner's criminal trial. In its memorandum of decision, the court found that Conway had represented Samperi at the January 13, 2016 proceeding in the weapons case. On appeal, the respondent concedes that there is evidence in the record to substantiate that finding in the form of a partial transcript of that proceeding, but nonetheless argues that this court should be left with a definite and firm conviction that a mistake has been made. We agree.

The following additional facts are relevant to this claim. As we have noted, Conway initially appeared on behalf of Samperi in the weapons case in March, 2015, and Silverstein filed an appearance in lieu of Conway in June, 2015. In addition, the habeas court found, and the record confirms, that, on January 8, 2016, Silverstein and Samperi appeared before the court, *Iannotti, J.,* and entered a plea in the weapons case under the *Alford* doctrine. See *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

Samperi returned to court five days later after a technical error with respect to that plea was discovered.[11] At the habeas trial, the petitioner submitted a partial transcript of the January 13, 2016 proceeding in the weapons case, which was marked as the petitioner's exhibit 26. That transcript states that Conway appeared on behalf of Samperi and Attorney Kevin Lawlor appeared on behalf of the state. That transcript is one and one-half pages in length. It begins with Conway confirming that he has filed an appearance on behalf of Samperi and then concludes with Conway requesting, and the

---

[11] As the trial court noted in the weapons case and as Bepko testified at the habeas trial, the plea entered by Samperi on January 8, 2016, had to be vacated because it provided for a suspended sentence to a charge that carried a mandatory minimum. The court described that error as a "[t]hree-way oversight" on the part of the court and the parties.

court and the state's attorney agreeing to, a continuance.[12]

The habeas court paradoxically was presented with a second transcript of the January 13, 2016 proceeding in the weapons case, which was admitted into evidence as the respondent's exhibit C. Unlike exhibit 26, the transcript in exhibit C states that Attorney Leo Ahern appeared on behalf of Samperi and that Bepko appeared on behalf of the state. The transcript in exhibit C is seven pages in length. Other than referring to Ahern and Bepko instead of Conway and Lawlor, the first one and one-half pages are identical to the transcript in exhibit 26 until the final sentence. Whereas the transcript in exhibit 26 ends with "[w]hereupon, the case

---

[12] The transcript in exhibit 26 states in full:

"The Clerk: Your Honor, I think you might have an old docket, number three is James Samperi.

"The Court: Mr. Conway, have you filed your appearance with the clerk? It's not printing.

"[Conway]: It should be there. If not, I could certainly do it right now.

"The Clerk: I do have it, I don't know why it didn't print.

"The Court: All right. What are we doing today?

"[Conway]: Your Honor, we had initial discussions, I have provided some documentation to the [prosecutor]. There might be a couple of other documents which may or may not be dispositive, but will certainly be helpful in moving this along. Perhaps if we could get a new date in the interim? I could communicate with the [prosecutor] and we could come to some kind of understanding about some of the facts of this case at least. Could I please have February 12th, Your Honor?

"The Court: That's not a holiday. I think the holiday is the fifteenth and eighteenth.

"The Clerk: No, the twelfth.

"The Court: Twelfth and fifteenth, that's why you are blank.

"[Conway]: How about the eleventh, Your Honor?

"[Lawlor]: That's fine with the state.

"The Court: February 11.

"[Conway]: It's a Thursday. Would a Monday be preferable?

"[Lawlor]: No, no.

"The Court: February 11.

"[Conway]: Thank you, Your Honor.

"The Defendant: Thank you.

"[Conway]: May I approach?

"(Whereupon, the case concluded.)"

concluded," the transcript in exhibit C states: "Whereupon, the case was recalled." The transcript in exhibit C then proceeds with a discussion of the technical error regarding Samperi's January 8, 2016 plea. See footnote 11 of this opinion. Ahern then moved to vacate that plea, which the court granted, and Samperi entered a new *Alford* plea to conspiracy to commit carrying a dangerous weapon in violation of General Statutes §§ 53a-48 (a) and 53-206, which the court accepted.

Both exhibit 26 and exhibit C purport to be transcripts of the January 13, 2016 proceeding in the weapons case. The transcripts both are authenticated and contain a certification page.[13] The certification date of the transcript in exhibit 26 is October 12, 2021; the certification date on the transcript in exhibit C is January 26, 2022. Both certification pages state that they are the "true and accurate" transcript of the proceedings held before the court, *Iannotti, J.*, on January 13, 2016. The only meaningful distinction between the transcript in exhibit 26 and the first one and one-half pages of the transcript in exhibit C is the identity of Samperi's counsel.

In its memorandum of decision, the court did not squarely resolve the question of precisely which transcript was an accurate depiction of the January 13, 2016 proceeding. Instead, it appears to have found both transcripts credible. The court, in crediting the transcript in exhibit 26, specifically found that "Conway represented Samperi at that hearing." At the same time, the court, in crediting the transcript in exhibit C, found that "Ahern appeared for Samperi in the weapons case," at which time "Ahern moved to vacate the plea and Samperi pleaded guilty to conspiracy to commit carrying a dangerous weapon in violation of . . . §§ 53a-48 and 53-206."

---

[13] The transcript in exhibit 26 is signed by Jean Kindley, certified court reporter. The transcript in exhibit C contains Kindley's electronic certification.

In light of those conflicting transcripts, the respondent argues that this court should be left with a definite and firm conviction that a mistake has been made, as "two transcripts attributing the same words to two different persons cannot both be correct." In that regard, the respondent emphasizes that, although the factual findings of a habeas court are governed by the clearly erroneous standard, it remains the burden of a habeas petitioner to establish the facts underlying a purported constitutional violation by a fair preponderance of the evidence. See, e.g., *Parke* v. *Raley*, 506 U.S. 20, 34–35, 113 S. Ct. 517, 526, 121 L. Ed. 2d 391 (1993); *Johnson* v. *Zerbst*, 304 U.S. 458, 468–69, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); *Arey* v. *Warden*, 187 Conn. 324, 331, 445 A.2d 916 (1982).

We agree with the respondent that both of the certified transcripts admitted into evidence cannot be correct. If the habeas court had credited either transcript over the other, and made findings consistent with the representations contained therein, the deferential standard that governs our review of factual determinations would be dispositive. That is not the case here, as the court credited both transcripts in its memorandum of decision.

Moreover, both transcripts begin with the court inquiring as to whether the counsel who represented Samperi had filed an appearance with the clerk.[14] In both transcripts, counsel responds by saying "[i]t should be" in the court file and the clerk, in both transcripts, confirms that "I do have it . . . ." Plainly, then, whomever appeared before the court on behalf of Samperi when the January 13, 2016 proceeding commenced had filed an appearance with the court.

---

[14] We reiterate that it is undisputed that Silverstein represented Samperi in the weapons case from the time that he filed his appearance on June 29, 2015, until the January 13, 2016 proceeding.

Under the anomalous and extraordinary circumstances of the present case, we agree with the respondent that it is appropriate to take judicial notice of certain filings in the court file for the weapons case.[15] That court file contains an appearance filed by Ahern on behalf of Samperi on January 13, 2016.[16] In addition, the court file contains a copy of a substitute information dated January 13, 2016, to which Samperi pleaded guilty to conspiracy to commit carrying a dangerous weapon in violation of §§ 53a-48 and 53-206. That document contains a handwritten note in the lower left corner that states in relevant part: "1-13-16 Attorney Leo Ahern filed appearance in addition to Rick Silverstein. . . ." Judge Iannotti's name appears in parentheses at the conclusion of that handwritten note. The court file for the weapons case does not contain an appearance or

---

[15] It is well established that an appellate court may take judicial notice of court files in other cases. See, e.g., *Drabik* v. *East Lyme*, 234 Conn. 390, 398, 662 A.2d 118 (1995) ("[t]here is no question that the trial court may take judicial notice of the file in another case, whether or not the other case is between the same parties" (internal quotation marks omitted)); *State* v. *Allen*, 205 Conn. 370, 382, 533 A.2d 559 (1987) ("judicial notice can be taken at any stage of the proceedings including on appeal"); see also *State* v. *Gaines*, 257 Conn. 695, 705 n.7, 778 A.2d 919 (2001) (taking judicial notice, in context of conflict of interest claim, of transcript from another defendant's case and other court files not referenced in trial court); *Lebron* v. *Commissioner of Correction*, 178 Conn. App. 299, 306 n.5, 175 A.3d 46 (2017) (taking judicial notice of contents of court file in petitioner's second habeas action even though "neither party submitted to the habeas court in the present action any portion of the pleadings or decision in the second habeas action"), cert. denied, 328 Conn. 913, 179 A.3d 779 (2018).

The contents of a court file are fundamentally distinct from other extrajudicial materials of which judicial notice properly may be taken. As our Supreme Court has observed, court files are "matters of established fact, the accuracy of which cannot be questioned . . . ." *Moore* v. *Moore*, 173 Conn. 120, 122, 376 A.2d 1085 (1977). For that reason, "[t]here is no question . . . concerning [an appellate court's] power to take judicial notice of files of the Superior Court, whether the file is from the case at bar or otherwise." *Karp* v. *Urban Redevelopment Commission*, 162 Conn. 525, 527, 294 A.2d 633 (1972).

[16] That appearance indicates that it was filed "in addition to an appearance already on file." The only other appearances in the weapons case file are Conway's March 2, 2015 appearance and Silverstein's June 29, 2015 appearance in place of Conway.

other filing from Conway at any point subsequent to Silverstein's June, 2015 appearance in lieu of him.

Those court files, considered in tandem with the unequivocal statement in both exhibit 26 and exhibit C that counsel for Samperi had filed an appearance in the weapons case, convince us that the court's finding that Conway represented Samperi at the January 13, 2016 hearing cannot stand. This is the rare case in which we are left with a definite and firm conviction that a mistake has been made. See *Sun Val, LLC* v. *Commissioner of Transportation*, 330 Conn. 316, 327, 193 A.3d 1192 (2018) ("we will not uphold a factual determination if we are left with the definite and firm conviction that a mistake has been made" (internal quotation marks omitted)). We therefore conclude that the court's finding that Conway represented Samperi at the January 13, 2016 hearing is clearly erroneous.

## II

The respondent also contends that the court improperly concluded that the petitioner had established that Conway was burdened by an actual conflict of interest that adversely affected his representation of the petitioner at his criminal trial. We agree.

"It is axiomatic that a criminal defendant's sixth amendment right to the effective assistance of counsel includes the right to counsel that is free from conflicts of interest. . . . It is a fundamental principle . . . that an attorney owes an overarching duty of undivided loyalty to his [or her] client. At the core of the sixth amendment guarantee of effective assistance of counsel is loyalty, perhaps the most basic of counsel's duties. . . . Loyalty of a lawyer to his [or her] client's cause is the sine qua non of the [s]ixth [a]mendment's guarantee that an accused is entitled to effective assistance of counsel. . . . That guarantee affords a defendant the right to counsel's undivided loyalty." (Citation omitted;

footnote omitted; internal quotation marks omitted.) *State* v. *Davis*, 338 Conn. 458, 469–70, 258 A.3d 633 (2021).

The parties submit, and we agree, that the standard propounded in *Cuyler* v. *Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), applies to the respondent's claim. In *Sullivan*, the United States Supreme Court explained that "multiple representation does not violate the [s]ixth [a]mendment unless it gives rise to a conflict of interest." Id., 348. It then held that, to establish a sixth amendment violation, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Id. The court further observed that, "until a [petitioner] shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Id., 350.

The United States Supreme Court clarified that standard in *Mickens* v. *Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). In *Mickens*, the court rejected the contention that, to establish a sixth amendment violation, a petitioner "need only show that his lawyer was subject to a conflict of interest, and need not show that the conflict adversely affected counsel's performance." Id., 170. As the court stated: "[W]e think 'an actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties. [That phraseology] was shorthand for the statement in *Sullivan* that a defendant who shows that a conflict of interest *actually affected the adequacy of his representation* need not demonstrate prejudice in order to obtain relief." (Emphasis in original; internal quotation marks omitted.) Id., 171; see also *Diaz* v. *Commissioner of Correction*, 344 Conn. 365, 377, 279 A.3d 147 (2022) (citing *Mickens* for proposition that "[a]n actual conflict, for

[s]ixth [a]mendment purposes, is a conflict of interest that adversely affects counsel's performance" (internal quotation marks omitted)).

As the United States Court of Appeals for the Fifth Circuit has observed, "[r]egardless of this clarification of the terminology, the relevant questions remain the same, and we must ask whether [counsel] labored under a conflict of interest, which was not merely hypothetical, and whether that conflict adversely affected the representation (i.e., whether it was an actual conflict)." *United States* v. *Infante*, 404 F.3d 376, 392 (5th Cir. 2005); see also *McFarland* v. *Yukins*, 356 F.3d 688, 706 (6th Cir. 2004) (noting that *Mickens* "changed the terminology, but not the substance" of test under *Sullivan*); *Moss* v. *United States*, 323 F.3d 445, 467 n.23 (6th Cir.) ("In *Mickens*, the Supreme Court clarified its prior definition of the term 'actual conflict of interest' as comprising both requirements of the *Sullivan* test—a conflict of interest and adverse effect. . . . An 'actual conflict of interest' therefore is a term of art requiring a conflict of interest and adverse effect. . . . [T]he 'actual conflict of interest' required in the first prong of the court's test requires only that the petitioner demonstrate a real or genuine, as opposed to a hypothetical, conflict of interest." (Citation omitted.)), cert. denied, 540 U.S. 879, 124 S. Ct. 303, 157 L. Ed. 2d 144 (2003).

In 2022, our Supreme Court released two opinions in short succession that pertained to the applicable test under *Sullivan*. In *State* v. *Davis*, supra, 344 Conn. 122, the court, quoting the decision of the Fifth Circuit in *United States* v. *Infante*, supra, 404 F.3d 392, explained that "[*w*]*hether a conflict of interest exists* depends on a number of factors, including, but not limited to, whether the attorney has confidential information that is helpful to one client but harmful to another; whether and how closely the subject matter of the multiple representations is related; how close in time the multiple

representations are related; and whether the prior representation has been unambiguously terminated. . . . This question is highly [fact sensitive]." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Davis*, supra, 344 Conn. 133–34. As *Infante* makes clear, that multifactored analysis pertains to the first prong of the test under *Sullivan*. See *United States* v. *Infante*, supra, 392. In *Davis*, our Supreme Court also elaborated on the sort of evidence that is required to establish that an attorney's conflict of interest adversely affected the representation of a client. See *State* v. *Davis*, supra, 344 Conn. 134–35 ("there is simply no evidence that [the interests of counsel and the client] ever diverged with respect to any material factual or legal issue, or to a course of action, or that [counsel's] representation of the defendant was otherwise impaired as a result of [counsel's] loyalty to [another client]").

Three weeks after *Davis* was released, our Supreme Court released its decision in *Diaz* v. *Commissioner of Correction*, supra, 344 Conn. 365. In *Diaz*, the court noted that "[t]he *Sullivan* standard is often framed as a two part test: [i]n order to establish a violation of the sixth amendment right to counsel based on defense counsel's actual, undisclosed conflict of interest, a petitioner must establish (1) that counsel actively represented conflicting interests and (2) that [the] actual conflict of interest adversely affected his [counsel's] performance." (Internal quotation marks omitted.) Id., 376–77. Citing to federal case law, the court then noted that, "[a]lthough framed as a two part test . . . in practice, [t]hese components are considered in a single, integrated inquiry. . . . That is to say, the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An actual conflict, for [s]ixth [a]mendment purposes, is a conflict of interest that adversely

affects counsel's performance." (Citation omitted; internal quotation marks omitted.) Id., 377. In *Diaz*, the court did not reference its recent decision in *State* v. *Davis*, supra, 344 Conn. 122, or the multifactored analysis set forth therein regarding the first prong of the test under *Sullivan.* The court has not since addressed the applicable standard for claims that an attorney was burdened by an actual conflict of interest that adversely affected his representation of a client.

We are mindful that, "[a]s an intermediate appellate tribunal, this court is not at liberty to modify, reconsider, or overrule the precedent of our Supreme Court." *State* v. *Siler*, 204 Conn. App. 171, 178, 253 A.3d 995, cert. denied, 343 Conn. 912, 273 A. 3d 694 (2021). Our obligation is to reconcile and harmonize the various precedents of our Supreme Court to the extent practicable. In our view, *State* v. *Davis*, 344 Conn. 122, and *Diaz* are not incongruous but, rather, reflect commentary on distinct aspects of *Sullivan* and its progeny, as developed in federal law. In *Diaz*, the court emphasized, consistent with *Mickens* v. *Taylor*, supra, 535 U.S. 172 n.5, that an actual conflict of interest is one "that adversely affects counsel's performance." (Internal quotation marks omitted.) In *Davis*, consistent with *United States* v. *Infante*, supra, 404 F.3d 376, on which it relied, the court articulated a multifactored analysis to determine "[w]hether a conflict of interest exists . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 344 Conn. 133. The court in *Davis* also set forth and applied various factors to determine whether an attorney's conflict of interest adversely affected the representation of a client. Id., 133–35. Read together, *State* v. *Davis*, supra, 344 Conn. 122, and *Diaz* are consistent with the observation of the United States Court of Appeals for the Sixth Circuit that *Mickens* "changed the terminology, but not the substance" of the test under *Sullivan. McFarland* v. *Yukins*, supra,

356 F.3d 706; see also *United States* v. *Infante*, supra, 392 ("[r]egardless of [*Mickens'*] clarification of the terminology [used in *Sullivan*], the relevant questions remain the same").

In light of the foregoing, we first consider whether Conway's prior representation of Samperi created a conflict of interest in his representation of the petitioner at trial. That inquiry is guided by the multifactored analysis set forth in *State* v. *Davis*, supra, 344 Conn. 133–34. We then consider whether any conflict of interest adversely affected Conway's representation of the petitioner at trial. Both questions involve mixed questions of law and fact. See id., 132–33; see also *United States* v. *Infante*, supra, 404 F.3d 391 ("[t]he determinations whether a conflict existed and whether the conflict had an adverse effect are mixed questions of law and fact"). Under the particular facts of this case, we conclude that no conflict of interest existed due to Conway's prior representation of Samperi and that, even if one did exist, it did not adversely affect Conway's representation of the petitioner at his criminal trial.

A

We begin with the question of whether a conflict existed due to Conway's representation of the petitioner and Samperi. In resolving that question, we consider "whether the attorney has confidential information that is helpful to one client but harmful to another; whether and how closely the subject matter of the multiple representations is related; how close in time the multiple representations are related; and whether the prior representation has been unambiguously terminated." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 344 Conn. 133–34. In its memorandum of decision, the court stated that it was "unclear whether Conway had confidential information that was helpful to Samperi but harmful to [the petitioner], or vice versa

. . . .” The court then stated that “the other [*Davis*] factors have been clearly established.”

There is nothing in the record before us to indicate that Conway possessed confidential information that was helpful to the petitioner but harmful to Samperi or vice versa, and the court did not make such a finding in its memorandum of decision.[17] See, e.g., *Hall* v. *United States*, 371 F.3d 969, 973 (7th Cir. 2004) (conflict of interest existed where counsel’s representation of another client “enabled him to learn confidential information pertaining directly to [his client’s] case”). Moreover, Samperi’s testimony at the habeas trial suggests that he did not provide confidential information to Conway.[18]

With respect to the second factor, the subject matter of Conway’s representation of Samperi and the subject matter of his representation of the petitioner were

---

[17] The January 8, 2016 transcript of the plea hearing in the weapons case was admitted into evidence at the habeas trial. During the canvass conducted by the court, the prosecutor acknowledged that the state was “okay” with an *Alford* plea because, while the two individuals who committed the burglary in that matter “gave up” Samperi, they admitted that they were the ones who had masterminded the conspiracy and that Samperi had been taken “along for the ride.” The prosecutor also admitted that the case against Samperi was weak. For those reasons, the state sought no incarceration or probation and simply requested a conditional discharge. We further note that, because Silverstein’s appearance in place of Conway occurred relatively early in a case in which the state’s evidence was weak, it is not surprising that there would be a dearth of confidential information that would have any bearing on Conway’s representation of the petitioner.

[18] On direct examination by the petitioner’s counsel at the habeas trial, Samperi was asked whether “[a]t any time prior to you taking the witness stand [in the petitioner’s criminal trial] . . . Conway ask[ed] you about what you know about [the petitioner’s] case,” whether Conway “ever discuss[ed] with you what he would ask you if you testified at [the petitioner’s criminal] trial,” and whether Conway “ever [told] you what he would not ask you if you testified at [the petitioner’s criminal] trial”; Samperi responded in the negative to each of those queries. In addition, Samperi was asked on cross-examination by the respondent’s counsel if he had spoken to Conway about his testimony prior to the petitioner’s criminal trial. Samperi replied, “[n]o, we didn’t speak about—he said it was confidential, can’t speak about it. You know, there’s nothing—no.”

somewhat related, as they involved firearms and Coutermash, a common accomplice.[19] We nevertheless disagree with the court that they were "closely related," as this is not a case in which the subject matter of Conway's representation of the petitioner and Samperi pertained to "the same alleged conspiracy"; *United States* v. *Infante*, supra, 404 F.3d 392; or the same criminal conduct. See, e.g., *Perillo* v. *Johnson*, 205 F.3d 775, 782–86 (5th Cir. 2000) (defense counsel represented two defendants in separate criminal trials arising from same acts and same capital murder charge); *Armstrong* v. *People*, 701 P.2d 17, 18–22 (Colo. 1985) (en banc) (conflict of interest existed where counsel represented husband and wife involved in same armed robbery incident); *State* v. *Galaviz*, 296 Kan. 168, 178–79, 291 P.3d 62 (2012) (counsel's representation of victim of underlying offense as guardian ad litem constituted conflict of interest in representing defendant in subsequent probation revocation proceeding regarding that underlying offense).

Samperi was charged in the weapons case with one count of conspiracy to commit theft of a firearm in violation of General Statutes §§ 53a-48 and 53a-212 stemming from a burglary incident that transpired in Milford in May, 2014. The petitioner, by contrast, was charged in the criminal matter underlying this habeas action with felony murder in violation of § 53a-54c, burglary in the first degree in violation of § 53a-101 (a) (1), and criminal possession of a firearm in violation of

---

[19] At the petitioner's criminal trial, Samperi testified that the gun used in the victim's murder was the gun that Marini sold to Coutermash "from a burglary that [Marini] did in Milford, I believe." On direct examination, Marini identified the firearm in question as the one he had sold to Coutermash and testified that it had been procured through a burglary in Milford. At the habeas trial, Conway acknowledged that there was evidence presented at the petitioner's criminal trial that the gun used in the victim's murder was one that Coutermash had acquired as a result of the Milford robbery at issue in the weapons case.

General Statutes (Rev. to 2013) § 53a-217 (a) (1) following the murder of the victim in his home in Hamden on October 19, 2014. There is no evidence in the record, and the petitioner has not argued, that Samperi was in any way involved in that October 19, 2014 incident.

As to the third factor, the court found that "Conway's representation of Samperi and the petitioner were simultaneous or, at best, extremely close in time." That determination was predicated, in part, on the court's finding that Conway represented Samperi at the January 13, 2016 proceeding in the weapons case. In part I of this opinion, we concluded that this finding, as well as the court's finding that Conway represented Samperi at the time of the petitioner's criminal trial, are clearly erroneous. To be sure, the record indicates that Conway represented both Samperi and the petitioner from March to June, 2015, at which time Silverstein appeared in place of Conway in the weapons case.[20] See footnote 8 of this opinion. Nothing in the record indicates that Conway subsequently filed an appearance or provided legal representation to Samperi until more than six months after the petitioner's criminal proceeding concluded. See footnote 9 of this opinion. As the petitioner acknowledges in his appellate brief, Silverstein "represented Samperi [in the weapons case] until . . . January of 2016."

With respect to the fourth factor, the court found that Conway's representation of Samperi "was not unambiguously terminated . . . prior to and during [the petitioner's] criminal trial." It is undisputed that, when Conway learned that Samperi was a potential witness in the petitioner's criminal trial, Conway told Samperi that he had to withdraw his representation of Samperi. It also is undisputed that, on June 29, 2015,

---

[20] The petitioner's criminal trial began approximately eight months after Silverstein replaced Conway as Samperi's counsel.

Silverstein appeared in place of Conway as Samperi's counsel in the weapons case. As discussed in part I of this opinion, the record contains no evidence that Conway thereafter represented Samperi in any legal proceeding prior, or otherwise, to or during the petitioner's criminal trial.[21] At the same time, the record indicates that, following his December, 2015 arrest on domestic related charges, Samperi contacted Conway for advice on how to proceed and that he subsequently retained Conway as counsel in 2017, more than six months after the petitioner's criminal proceeding concluded. That evidence suggests that, although Conway had terminated his representation of Samperi in June, 2015, Samperi continued to operate as though he could consult with Conway on legal matters. Samperi nevertheless testified at the petitioner's habeas trial that Conway specifically informed him that Conway could not continue to represent him due to his representation of the petitioner.[22]

In articulating the foregoing factors in *State* v. *Davis*, supra, 344 Conn. 133–34, our Supreme Court emphasized that the relevant inquiry is dependent on a number of factors and is not limited to those quoted from *United States* v. *Infante*, supra, 404 F.3d 392. In our view, the character and extent of an attorney's representation of

---

[21] In its memorandum of decision, the court found that, "[a]t the time of [the petitioner's] criminal trial, Conway continued to represent Samperi in what is best described as an 'on-and-off-and-on again' manner." That finding presumably is predicated on the court's erroneous finding that Conway appeared on behalf of Samperi at the January 13, 2016 proceeding in the weapons case. The court did not identify any other legal proceeding in which Conway represented Samperi prior to the conclusion of the petitioner's criminal trial and the record is devoid of evidence of such representation. See footnote 9 of this opinion.

[22] Samperi testified that Conway told him that, due to his representation of the petitioner, "he had to back out [of the weapons case and] he couldn't be my lawyer anymore." Samperi similarly testified, when asked about Silverstein's involvement in that case, that Conway had told him that his representation of the petitioner could give rise to a conflict of interest, so Conway "had to turn my case over to another attorney."

another client is a critical consideration in ascertaining whether a conflict of interest exists.

At the habeas trial, the petitioner presented no evidence regarding the substantive nature of Conway's representation of Samperi in the weapons case. Conway began representing Samperi in March, 2015, and was replaced by Silverstein in June, 2015. At the habeas trial, Conway testified that he only recalled appearing in court on behalf of Samperi once or twice prior to his replacement by Silverstein. Conway also acknowledged that some scheduled appearances during that time period may have been continued "without anybody showing up" to court. See, e.g., *Marshall* v. *Commissioner of Correction*, 184 Conn. App. 709, 717–19, 196 A.3d 388 (noting, in support of conclusion that no conflict of interest existed due to counsel's simultaneous representation of witness for brief period who later testified at petitioner's criminal trial, that counsel had represented that witness for only "approximately four months" and that there were not "a lot of things going on with the case while [counsel] represented [the witness] other than getting pretrials"), cert. denied, 330 Conn. 949, 197 A.3d 389 (2018).

The limited nature of Conway's representation of Samperi in the weapons case stands in stark contrast to *Perillo* v. *Johnson*, supra, 205 F.3d 775. In that case, Attorney Jim Skelton served as defense counsel to Linda Fletcher, who was charged along with Pamela Perillo and Mike Briddle with capital murder arising out of the same incident. Id., 782–83. After Fletcher's trial, she and Skelton "stayed in contact with each other by written correspondence and with telephone calls. Skelton also developed a close relationship with Fletcher's mother. . . . [W]hen Fletcher planned to remarry, Skelton was asked to come to California and give the bride away. Skelton agreed, and traveled to California to spend several days participating in the wedding festivities with

Fletcher's family." Id., 784. When Fletcher returned to Texas in 1981 to testify as a witness for the state in Briddle's criminal trial, "she stayed with Skelton for between seven and ten days in his one bedroom condominium." Id., 786.

When Skelton subsequently was appointed to represent Perillo in her criminal trial in November, 1983, he did not alert her to his prior representation of Fletcher. Id. In preparing for Perillo's trial, he met with Fletcher, allowed her to again stay in his condominium, and worked at length with her to ensure that her testimony was consistent with her prior testimony at Briddle's trial and to afford her "a preview of [his] cross-examination on Perillo's behalf." Id., 788–89. In concluding that an actual conflict existed with respect to Skelton's representation of Perillo and Fletcher, the court stated that "[w]here the prior representation involved a . . . substantial attorney-client relationship, a finding of actual conflict is more likely. . . . Where, however, defense counsel's involvement in the prior representation was either transient or insubstantial, we have been less inclined to find an actual conflict." (Citation omitted.) Id., 799.

Unlike in *Perillo*, the petitioner in the present case provided no evidence that Conway's simultaneous representation of Samperi and the petitioner in the early stages of both the petitioner's criminal action and the weapons case involving Samperi was anything other than transient and insubstantial. Considered in totality, the foregoing factors convince us that Conway's simultaneous representation of Samperi and the petitioner for four months in 2015 did not create a conflict of interest with respect to Conway's representation of the petitioner at his criminal trial. The habeas court improperly concluded to the contrary.

B

Even if we were to conclude that a conflict of interest existed, the petitioner still could not prevail. On our thorough review of the record before us, we conclude that the petitioner failed to satisfy his burden of demonstrating that Conway was hampered by a conflict of interest that adversely affected his representation of the petitioner.

In *State* v. *Davis*, supra, 344 Conn. 122, our Supreme Court noted that "an attorney may be considered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client . . . ." (Internal quotation marks omitted.) Id., 133. To establish that a conflict of interest adversely affected the representation of a client, the court explained, there must be evidence that the interests of counsel and the client diverge "with respect to any material factual or legal issue, or to a course of action, or that [counsel's] representation of the defendant was otherwise impaired as a result of [counsel's] loyalty to [another client]." Id., 134–35. That explication is consistent with the court's earlier pronouncement in *State* v. *Davis*, supra, 338 Conn. 458, that "[o]nce a [party] has established that there is an actual conflict, he must show that a lapse of representation . . . resulted from the conflict. . . . To prove a lapse of representation, [that party] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (Internal quotation marks omitted.) Id., 478 n.13; see also *Diaz* v. *Commissioner of Correction*, supra, 344 Conn. 378 (same).

1

In its memorandum of decision, the court identified only one defense strategy or tactic that was available, but not pursued by Conway—his "failure to use Samperi's prior convictions and pending cases to attack his credibility." On appeal, the petitioner maintains that attacking Samperi's credibility was a plausible line of attack, which establishes the requisite adverse impact on Conway's representation.[23] We do not agree.

At the outset, we note that the court's conclusion that impeaching Samperi with his prior convictions was a plausible tactic ignores the undisputed fact, which both the state and Conway emphasized during jury selection and at trial, that the petitioner and several of the witnesses had significant criminal histories. As Conway reiterated during closing argument, both he and the prosecutor in voir dire sought assurances from the jurors that they would not allow a witness' criminal history to impact their ability to assess the credibility of witnesses.

In its memorandum of decision, the court found that "Conway did not attack Samperi's credibility because he assessed Samperi's testimony as helpful to the defense and made . . . a tactical decision to not impeach [him]." The court nonetheless opined that "[w]hether or not Conway thought Samperi's testimony

---

[23] To the extent that the petitioner relies on *State* v. *Crocker*, 83 Conn. App. 615, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), and *State* v. *Taylor*, 177 Conn. App. 18, 171 A.3d 1061 (2017), cert. denied, 327 Conn. 998, 176 A.3d 555 (2018), those cases are inapposite, as they involved pretrial disqualification regarding a defendant's sixth amendment right to counsel of choice. Unlike requests for postconviction relief, for which an actual conflict must be established; see, e.g., *State* v. *Davis*, supra, 344 Conn. 132; *Marshall* v. *Commissioner of Correction*, supra,184 Conn. App. 714–21 (2018); in cases involving pretrial disqualification, a party can prevail if they establish that "a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." (Internal quotation marks omitted.) *State* v. *Crocker*, supra, 626.

could or would be helpful to the defense is irrelevant to determining whether a conflict existed . . . ." We disagree. First, the court's statement is contrary to *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 591 n.20, 867 A.2d 70, cert. denied, 273 Conn. 930, 873 A.2d 997 (2005), in which this court noted that, "[i]n determining whether counsel's performance was adversely affected by an actual conflict of interest, counsel's testimony regarding the reasons for his or her trial strategy is wholly proper evidence to be considered . . . by the court."[24]

At the habeas trial, Conway testified that "the basic facts" of the petitioner's criminal case "were that someone came to collect a debt owed" by the victim. In formulating a defense strategy, the petitioner gave Conway three different accounts of what transpired on October 19, 2014. The petitioner's third version—that Coutermash had offered to give the petitioner a ride in exchange for "a favor" of backing up Coutermash while collecting a debt from the victim, who was "a pretty big guy"—fit best with the evidence. That defense strategy placed Coutermash in the victim's residence with a knife, where he slashed the victim during an altercation prior to fleeing. Consistent therewith, Conway pursued a defense that centered around demonstrating that the petitioner lacked the intent to commit a robbery and, thus, could not be convicted of felony murder. Conway testified that, for this strategy to have any chance of success, he "had to get [Coutermash] placed [inside the victim's residence] somehow some way." Conway further testified that "the only person [he] really had to fulfill that role of, sort of, an independent witness was Samperi." For that reason, Conway "was thrilled

---

[24] As the United States Supreme Court noted in *Sullivan*, "[a]n attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." (Internal quotation marks omitted.) *Cuyler* v. *Sullivan*, supra, 446 U.S. 347.

when the state said they were going to call him as a witness." Moreover, in light of the defense strategy pursued at trial, Conway testified that he deliberately declined to question Samperi about his prior convictions or pending cases on cross-examination because Conway "wanted the jury to believe [Samperi's] testimony because he was saying things that were favorable to [the petitioner]." Conway believed that Samperi's testimony supported the defense theory that the crimes were "not something that [the petitioner] would have organized or had it in his mind or . . . taken the initiative on. [Samperi's testimony] was there to show that there had to be somebody else, [Coutermash] . . . that had to be the driving force behind whatever went down" at the victim's residence.

Second, "to amount to an unconstitutional lapse in representation, an alternative defense not undertaken must be 'plausible' and 'viable,' as well as in conflict with counsel's other interests." *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 589, 867 A.2d 70, cert. denied, 273 Conn. 930, 873 A.2d 997 (2005); see also *Winkler* v. *Keane*, 7 F.3d 304, 309 (2d Cir. 1993) ("[T]o prove adverse effect on the basis of what an attorney failed to do, [a party] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative." (Internal quotation marks omitted.)), cert. denied, 511 U.S. 1022, 114 S. Ct. 1407, 128 L. Ed. 2d 79 (1994); *United States* v. *Williams*, 902 F.3d 1328, 1332–33 (11th Cir. 2018) (same). A determination that an alternative strategy or tactic is viable, in turn, requires a showing that it would have meaningfully assisted the client in some way. See, e.g., *Bigelow* v. *Commissioner of Correction*, 146 Conn. App. 737, 744 n.4, 80 A.3d 84 (2013) (alternative strategy of placing

blame on petitioner's brother "was simply not a plausible, viable defense based on the facts of the case" (internal quotation marks omitted)).

In the present case, all of the evidence offered by the state at the petitioner's criminal trial, and the testimony of Vivian and Ashante in particular, pointed to only one perpetrator in the homicide that occurred at 397 Circular Avenue on October 19, 2014. The petitioner, by contrast, testified at trial that both he and Coutermash entered that residence because Coutermash needed to collect a debt, that a struggle subsequently ensued between himself and the victim, and that the gun in the petitioner's hand discharged during that struggle.[25] Samperi was the only witness who could substantiate the petitioner's account in any manner, which he did in his testimony at the petitioner's criminal trial.[26] In addition, Samperi's testimony, coupled with

[25] As this court recounted in the petitioner's direct appeal: "[T]he [petitioner] testified at trial and was the final witness called by the defense. . . . [He] testified that, on October 19, 2014, Coutermash told him that he needed to 'collect some money' from someone. . . . [The petitioner] claimed that when he and Coutermash arrived at 397 Circular Avenue, both of them entered the victim's apartment, and Coutermash demanded $400 from the victim. The [petitioner] testified that he entered the victim's apartment only after Coutermash and the victim began fighting and when things were 'getting out of control . . . .' Upon entering the apartment, the [petitioner] told the victim: '[L]isten, just give [Coutermash] his money—you know—let me get the hell out of here, just give him what you owe him, it's gone far enough, it's out of control, just give him his money, you know.' The [petitioner] further testified that, immediately after he told the victim to give Coutermash money, Coutermash fled the apartment. At that point, the [petitioner] claimed that the victim charged at him, the two began to struggle over the gun in his hand, and the gun 'went off' twice during the struggle." (Citation omitted.) *State* v. *Papantoniou*, supra, 185 Conn. App. 100–101.

[26] At the petitioner's criminal trial, Samperi testified that he spoke with Coutermash the day after the victim's murder and that Coutermash seemed nervous. Samperi testified that Coutermash told him that "he fucked up" and that "he screwed up bad." On cross-examination, Samperi also testified that "[Coutermash] told me that he went there to collect a debt, he had the fight with the guy."

In addition, Samperi testified that, prior to the victim's murder, Coutermash and Marini had multiple conversations in his presence about robbing the victim. Samperi testified that the petitioner was not present for those

Coutermash's desire to collect a debt from the victim, was the only evidence that cast doubt on the state's contention that the petitioner possessed the mental state necessary to commit the underlying felony, which in this case is burglary in the first degree, on which the felony murder charge is predicated.

We agree with the respondent that the only alternative tactic identified by the petitioner—impeaching Samperi's testimony—would have left the petitioner with no support for his version of events that placed Coutermash inside the victim's residence as an active participant seeking to collect a debt. Such impeachment is not a plausible alternative strategy because it in no way would have supported an alternative defense to the felony murder and burglary charges faced by the petitioner. See *Marshall* v. *Commissioner of Correction*, supra, 184 Conn. App. 719–21 (failure to impeach former client with pending charges insufficient to demonstrate conflict adversely affected performance). In this case, there was no divergence with respect to the interests of the petitioner and Conway regarding that course of action.[27] See *United States* v. *Williams*, 372 F.3d 96, 102 (2d Cir. 2004); *State* v. *Davis*, supra, 344 Conn. 134; *Mercer* v. *Commissioner of Correction*, 51 Conn. App. 638, 644, 724 A.2d 1130, cert. denied, 248 Conn. 907, 731 A.2d 309 (1999). We therefore conclude that Conway's failure to impeach Samperi did not adversely affect his representation of the petitioner. To the contrary, it demonstrates that Conway was acting in the petitioner's best interest with respect to the one

conversations. Samperi also identified a knife found at the crime scene as one that looked like a knife he had given to Coutermash.

[27] In its memorandum of decision, the habeas court found that the petitioner "thought Samperi would be very helpful [as a witness at his criminal trial], especially providing an innocent explanation for the knife [recovered at the scene]." The court also noted Conway's testimony at the habeas trial that the petitioner "wanted [Samperi] to testify" at his criminal trial.

witness who could corroborate the petitioner's account of what transpired on October 19, 2014.[28]

[28] As Conway argued during closing argument, Samperi's testimony was "consistent with what [the petitioner] testified. [Samperi] testified that he talked to [Coutermash] within a day or so of what happened. Lifelong friends, confidants . . . . [Samperi] had gotten wind of what had gone down, confronts [Coutermash]—dude, what happened? I fucked up. I went to go collect—get some money and a fight broke out, I fucked up. Not we, I. Consistent with [the petitioner's] testimony. Four days later, after viewing the news and all the stories associated, knowing that he's a suspect, [Coutermash] attempts to control the narrative. Now he tells [Samperi] all right, this is what happened, in greater detail . . . but that's not as persuasive as if he had said it moments afterwards perhaps. [Coutermash] is no dummy. He knew based on the accounts in the paper and the fact that [the petitioner] had told him that he left his hat in there and the sweatshirt, something bad had happened, someone was going down for it, it wasn't going to be [Coutermash]; and he also knew the police would be talking to other people, he wanted to get his story out there so they would tell them the same story."

Furthermore, in arguing that the victim had let the petitioner and Coutermash into his residence, Conway emphasized that there was no evidence of forced entry, just banging on the door, based on the lack of damage to the entry way. Conway also highlighted evidence that the victim's wife testified to the fact that the victim had one hour earlier asked his wife for $400, from which he asked the jury to infer that the victim knew that someone would be coming by for $400. He then argued that there was no evidence that anyone owed the petitioner any money and that, "by all accounts, [the petitioner] was a sad sack. Doesn't have a car, walks everywhere, never explained by anybody, that $400, never said who the hell are you and why are you asking for $400. It's such a specific amount. . . . So, there was no unlawful entry if he was standing outside and [Coutermash] was invited in by [the victim]. That's not unlawful entry. Remained in the hallway until things got out of hand. They got out of hand because [Coutermash] made them get out of hand, hitting [the victim] in the head with the butt of the knife and slashing, and at that point, [Coutermash] freaked out and [the petitioner] says chill, chill, chill, stop. [The petitioner] didn't want to be a part of that; he just wanted to stop. He did say dude, just give him his $400 and get the hell out of here . . . . He wanted to get the hell out of there. [Coutermash] sees his opportunity, bolts out the door, [the petitioner] turns, gun in hand, [the victim] lunges, and the events proceed from there. [The petitioner] was trying to get out. He wanted to get out so bad, he's wiggling out of his sweatshirt. He couldn't, [the victim] wouldn't let him. He didn't want to remain there; he wanted to get the hell out of there.

"Intent to rob, that's . . . on the burglary, right? Enter or remain unlawfully . . . . That's the first part, and the second, with the intent to commit a crime therein. The crime alleged by the state was robbery. Again, I go back, the $400, and the testimony from [Samperi] about what [Coutermash] said and what [the petitioner] said. Ride with me, watch my back, I'm going to collect a debt. Give me my $400. An hour before, [the victim] had asked

The court also found that an actual conflict of interest adversely affected Conway's performance due to his failure to comply with certain Rules of Professional Conduct, which required Conway to notify the petitioner in writing of his prior representation of Samperi. We do not agree.

Although the Rules of Professional Conduct properly can inform a court's legal analysis, the rules themselves are not the law. As our Supreme Court has explained, "[a]ttorney conduct may breach ethical standards . . . without violating the sixth amendment right to counsel." *Diaz* v. *Commissioner of Correction*, supra, 344 Conn. 389–90. Significantly, our Supreme Court has clarified that, "although there undoubtedly is some overlap, the constitutional right to effective assistance of counsel, and the rules that govern attorney ethical conduct serve fundamentally different purposes." Id., 390. The fundamental purpose of the Rules of Professional Conduct is to guide an attorney's ethical conduct; by contrast, the fundamental purpose of the sixth amendment right to effective counsel is to ensure "a fair trial based on competent representation." (Internal

---

his wife for $400. Coincidence? You make the call. My $400. It's no different than if he had lent [a television] set to Larry, he went back and said give me my [television] back . . . . He's not trying to deprive another of their property forever. No intent to rob on the part of [the petitioner]. . . . Only one person had an intent in that incident, [Coutermash]. . . .

  "[The petitioner] is the perfect scapegoat and he's not an angel . . . . I'm not asking you to feel sorry for him. [Coutermash] thought very little of him, [the petitioner] was a drunk at the time barely getting by, relying on others. His boss asked him to come in and watch my back and I'll pay you some of the money that we owe you—he hadn't been paid for the month of October. . . . Coutermash was the alpha dog here, [the petitioner] was the mutt, and . . . at the last minute, here, hold [the gun]. . . . [Coutermash] planned this, he dressed all in black, he brought the gun, he bought the gun, he was owed money, he drove, he made admissions to [Samperi], he covered his tracks by sanitizing things, he took a . . . deal that took 220 years off of the table by sitting in that chair right there and talking to you. . . ."

quotation marks omitted.) Id.; see also *Nix* v. *Whiteside*, 475 U.S. 157, 165, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986) ("breach of an ethical standard does not necessarily make out a denial of the [s]ixth [a]mendment guarantee of assistance of counsel").

In its memorandum of decision, the court began its analysis of the petitioner's sixth amendment conflict of interest claim by noting rules 1.7 and 1.9 of the Rules of Professional Conduct, as well as the commentary thereto.[29] The court then declared: "The present habeas

[29] Rule 1.7 of the Rules of Professional Conduct provides: "(a) Except as provided in subsection (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

"(1) the representation of one client will be directly adverse to another client; or

"(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

"(b) Notwithstanding the existence of a concurrent conflict of interest under subsection (a), a lawyer may represent a client if:

"(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

"(2) the representation is not prohibited by law;

"(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or the same proceeding before any tribunal; and

"(4) each affected client gives informed consent, confirmed in writing."

Rule 1.9 of the Rules of Professional Conduct provides in relevant part: "(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing. . . .

"(c) A lawyer who has formerly represented a client in a matter . . . shall not thereafter:

"(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

"(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client."

The commentary to rule 1.9 provides in relevant part: "The scope of a 'matter' for purposes of this [r]ule depends on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific

corpus matter is a cautionary tale because it is a dispute caused by ambiguities created by Conway operating under an undisclosed actual or potential conflict of interest. Conway did not, in contravention of rule 1.7 [of the Rules of Professional Conduct], obtain written consent from [the petitioner]. The lack of full disclosure to [the petitioner], opposing counsel, and the court demonstrates that [the petitioner] was deprived of his right to a fair criminal trial because Conway operated under a conflict of interest."[30] In discussing Conway's failure to comply with those Rules of Professional Conduct, the court stated that "[t]he consent confirmed in writing is crucial." Throughout the remainder of its decision, the court repeatedly emphasized Conway's failure to disclose his representation of Samperi to the petitioner in writing.[31]

transaction, subsequent representation of other clients with materially adverse interests in that transaction clearly is prohibited. . . .

"Matters are 'substantially related' for purposes of this [r]ule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Rules of Professional Conduct 1.9, commentary.

[30] At the habeas trial, Conway testified that he informed the petitioner of his prior representation of Samperi and that the petitioner was "well aware of the fact that [he had] represented Samperi." In its memorandum of decision, the court noted that this testimony was contradicted by that of the petitioner. The court nevertheless did not resolve that critical factual discrepancy. Instead, it stated: "While it is unclear precisely what was said between Conway and [the petitioner] about Samperi, it is clear that Conway did not disclose his conflict in writing to [the petitioner] . . . ."

[31] For example, on page twenty-seven of its decision, the court stated that Conway "did not disclose his conflict in writing" and "obtain [the petitioner's] written consent to continue with Conway after such a disclosure." On page twenty-eight of its decision, the court stated that Conway's assessment of the helpfulness of Samperi's testimony at the petitioner's criminal trial "is irrelevant to determining whether a conflict existed and disclosing it to [the petitioner] in writing." On page twenty-nine of its decision, the court stated: "Conway's failure to disclose his conflict in writing foreclosed [the petitioner's] opportunity to proceed with a conflict that he had properly waived." On page thirty-two of its decision, the court stated: "Conway failed to properly disclose this conflict of interest to [the petitioner] in writing."

We are aware of no authority, from Connecticut or elsewhere, which holds that a petitioner in a habeas action may satisfy his burden under *Sullivan* of demonstrating that an actual conflict of interest adversely affected his counsel's representation by establishing a breach of the Rules of Professional Conduct generally, or the duty under rule 1.7 to disclose a potential conflict of interest to a client in writing specifically. In *Diaz* v. *Commissioner of Correction*, supra, 344 Conn. 365, our Supreme Court addressed that issue and stated: "[A] petitioner carries a higher burden in establishing a sixth amendment violation on the basis of an alleged conflict of interest than would be necessary to establish that an attorney ran afoul of the Rules of Professional Conduct. Specifically, in order to establish a violation of his constitutional right, the petitioner must establish that an actual conflict of interest adversely impacted the representation . . . and not merely that there was a significant risk of a material limitation [pursuant to rule 1.7 (a) (2)]." (Citation omitted.) Id., 389 n.11. *Diaz* thus instructs that whether an attorney complied with the Rules of Professional Conduct is not the relevant inquiry. Although a failure to comply with those rules is "unbecoming of an officer of the court"; id., 390; and cannot be condoned, the relevant inquiry for purposes of an ineffective assistance of counsel claim is whether the petitioner established that counsel "was burdened by an actual conflict of interest that adversely affected [his] performance." *State* v. *Davis*, supra, 344 Conn. 126.

In light of the foregoing, we conclude that proof that an attorney violated rule 1.7 of the Rules of Professional Conduct does not suffice to establish a violation of a client's sixth amendment right to effective assistance of counsel. To prevail on such a claim, a party "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler* v. *Sullivan*, supra, 446 U.S. 348. That burden is satisfied by proof

that an actual conflict of interest existed; see *State* v. *Davis*, supra, 344 Conn. 133–34; and that "some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, supra, 344 Conn. 378. The petitioner in the present case did not meet that burden. We therefore conclude that the habeas court improperly determined that the petitioner's sixth amendment right to effective assistance of counsel was violated.

The judgment is reversed with respect to counts one and two of the second amended petition alleging ineffective assistance of counsel and the case is remanded with direction to deny the petition for a writ of habeas corpus.

In this opinion the other judges concurred.